297 S.E.2d 843

## The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR

### v.

### Richard F. PENCE.

### No. 13579.

Supreme Court of Appeals of West Virginia.

Nov. 18, 1982.

Robert H. Davis, Jr., Counsel, Committee on Legal Ethics, Charleston, for complainant.

Richard F. Pence, pro se.

McGRAW, Justice:

This is a petition by Richard F. Pence for reinstatement of his license to practice law. The Committee on Legal Ethics of the West Virginia State Bar recommends that the petitioner's license not be reinstated and requests reimbursement for the reasonable and necessary costs expended incident to this and a previous proceeding involving the petitioner. We deny the petition and grant the Committee's request.

The license of the petitioner was originally suspended by this Court for a period of one year, effective July 1, 1975, based on full, clear, and preponderating evidence that he had comingled funds of his client with his own, that he failed to pay promptly on demand the funds of his client, and that he had submitted to the Ethics Committee in the course of its investigation a misleading bank deposit slip. *Committee on Legal Ethics v. Pence*, W.Va. 216 S.E.2d 236 (1975). The Court ordered the petitioner to reimburse the Ethics Committee for all expenditures incurred in connection with that proceeding. Such expenditures were paid by the petitioner.

After expiration of the suspension period, the petitioner filed a petition seeking to have his license reinstated. The Ethics Committee conducted a preliminary investigation and recommended that reinstatement be denied. On February 15, 1977, the Court ordered that the petitioner's license be restored on July 1, 1977, provided the Ethics Committee did not institute proceedings seeking disciplinary action, and provided the petitioner, by that date, had not been convicted of a criminal offense.

On June 29, 1977, the Ethics Committee instituted a disciplinary proceeding against the petitioner, charging multiple violations of the Code of Professional Responsibility. The Committee's complaint alleged that the petitioner failed to pay promptly on demand money owing and due two of his clients; that he comingled funds; that he engaged in conduct involving dishonesty, fraud, and deceit or misrepresentation; that he intentionally prejudiced a client; that he knowingly failed to disclose information he was required by law to reveal; that he knowingly made false representations of fact; that he counseled and assisted his client in conduct known to be illegal; and that he engaged in conduct which was both illegal and contrary to the disciplinary rules of the profession.

After review of the record the Court concluded that each of these charges had been proved by full, clear and preponderating evidence, and ordered that the petitioner's license to practice law be annulled, effective July 1, 1975. *Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668 (1978). The Court ordered the petitioner to reimburse the Ethics Committee for the actual and necessary expenses reasonably incurred in connection with the proceeding. This, apparently, has yet to be done by the petitioner.

On October 13, 1981, after five years had elapsed since the annulment of his license to practice law, the petitioner filed his petition praying that his license to practice law be reinstated, pursuant to art. VI, § 35 of the By-Laws of the West Virginia State Bar. Upon notification of the filing of the petition, the Legal Ethics Committee began its investigation into the facts relating to the petitioner's fitness to practice law. Hearings were held on February 11, 12, 26 and 27, and on March 5, 6, 29 and 30 of this year. Upon the evidence adduced at these hearings the Committee found that the petitioner had engaged in the unauthorized practice of law while subject to this Court's annulment order, and concluded that the petitioner had failed to establish that he had undergone the basic and necessary changes in financial responsibility, personal integrity and trustworthiness required of a practicing attorney. The Committee further concluded that reinstatement of the petitioner would result in a substantial danger to the public and the public finances. Accordingly, in this proceeding the Committee unanimously recommends that the

petitioner's petition for reinstatement of his license to practice law be denied by this Court.

Initially, we note that the petitioner bears the burden of showing that he presently possesses the integrity, moral character, and legal competence to resume the practice of law. In syllabus point one of *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980), this Court held:

The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.

The record must demonstrate that there is little likelihood that the petitioner, if readmitted to the practice of law, will engage in unprofessional conduct: "Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." Syllabus Point 2, *In re Brown, supra.*

In determining whether the petitioner is entitled to reinstatement we look first to the seriousness of the underlying offense leading to disbarment. *In re Brown, supra; In re Smith*, 166 W.Va. 22, 270 S.E.2d 768 (1980). The conduct leading to the petitioner's disbarment involves multiple violations of the Code of Professional Responsibility, including the comingling of funds, the failure to pay over client funds on demand, and several instances of fraudulent and illegal conduct.[1] These are seri-

ous offenses which indicate a lack of good moral character and integrity required of a practicing attorney. Nevertheless, we do not here hold that the conduct of the petitioner which led to his disbarment precludes his reinstatement. However, beyond the serious nature of these original offenses, we are here confronted with facts which indicate the petitioner has not undergone rehabilitation with respect to his financial responsibility and personal integrity consistent with that of an officer of the court. The record reveals that during the period of his disbarment the petitioner was involved in several episodes of questionable financial dealings with clients and business associates, and engaged in conduct precariously approaching the unauthorized practice of law.

For example, it was the testimony of Raymond H. Boatright that he met with the petitioner in December, 1976, in connection with an automobile accident, and the petitioner agreed to take the case on a one-third contingent fee basis. Subsequent conferences took place in January, 1977. Some funds were obtained in the case, and $1690.70 was left with the petitioner. Mr. Boatright subsequently learned of the petitioner's disbarment and testified that when confronted with this, the petitioner stated he had been reinstated. Ultimately, Boatright secured attorneys in Columbus, Ohio, and obtained a substantial judgment. Mr. Boatright further testified that he later employed Fred W. Crow, an attorney in Ohio, to obtain a refund of the money covered by the check received by the petitioner in the amount of $1696.70, and that after correspondence and calls, the petitioner assigned a prospective fee for some work done for a South Carolina real estate developer to pay this obligation, but that it was never paid.

Kennard Betts testified that he called on the petitioner in October, 1977, in connection with an automobile accident, and petitioner undertook to represent him. At the time, Mr. Betts did not know of the petitioner's disbarment. He delivered a

---

1. The conduct of the petitioner leading to his disbarment is set out in detail in *Committee on* *Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668, 670–671 (1978).

check for $1500 payable to the petitioner and the petitioner's investigator, Ron De-Vol, on November 11, 1977. A check in the amount of $1250 was also delivered to the petitioner, on which Mr. Betts stopped payment. The petitioner failed to appear at a scheduled hearing, and subsequently Mr. Betts obtained the services of another attorney, who collected the $1500 from the petitioner on a fifty percent contingent basis and paid one-half of it to Mr. Betts. Mr. Betts received no reports from the petitioner or Mr. Ron DeVol in connection with his case.

Jo Ann Frame testified that through her accountant, a Mr. Carder, she was introduced to the petitioner in February, 1979. It was agreed that a corporation would be formed by the petitioner, Mr. Carder, and Mr. and Mrs. Frame. The purpose of this corporation, known as Car Club, Inc., was to buy automobiles at a reduced price through a source in Detroit, and that for a membership fee, individuals could purchase motor vehicles at a much lower price than normal. The petitioner and Mr. and Mrs. Frame were each to pay in $15,000, and each would hold thirty shares of stock. Mr. and Mrs. Frame delivered three checks to the petitioner, each for $5000. The petitioner was to use this money to procure advertising through an Atlanta television station. The funds were to be used for an initial payment of $7000 to the television station and the remainder was to be placed in a corporate bank account. Two signatures were to be required for disbursement of corporate funds.

Mrs. Frame further testified that to the best of her knowledge no one else ever put any money into the corporation and no one ever obtained an automobile through Car Club, Inc. Mrs. Frame did know that the petitioner had been disbarred, and testified that he told her he could not go into court, but could form the corporation and act as legal adviser. Mr. and Mrs. Frame did receive the thirty shares of stock. However, there is no record of any accounting ever being made for the $15,000 delivered to the petitioner by Mr. and Mrs. Frame, and no record of what happened to it, other than that the petitioner did procure a corporate charter.

There is no credible evidence to support the petitioner's claim that a considerable portion of the Frames' investment of $15,000 was spent to organize or to promote Car Club, Inc. The petitioner agrees that he held the $15,000, in cash, in his office, for the corporation and that he can neither produce the $15,000 nor account to the Frames for his handling of such funds. The petitioner did at one time execute a note payable to the corporation for $15,000, apparently to cover his share of the stock. However, there is no evidence of any payment.

Becoming dissatisfied with the petitioner's progress in getting the corporation going, Mr. and Mrs. Frame procured legal counsel to recover their $15,000 investment. In June 1980, they brought proceedings against Car Club, Inc., and the petitioner, seeking recovery of $15,000 and an accounting. The petitioner, as an outgrowth of that proceeding, executed his note to Mrs. Frame in the amount of $15,000 due January 1, 1982. The note was not paid and an action has been filed to collect it.

Dr. Donald Pritt, a podiatrist in Parkersburg, West Virginia, testified that a friend, Dr. John W. Cain, also a podiatrist, had proceedings pending against him in Arkansas seeking to annul his license to practice in that state. In response to an inquiry from Dr. Cain, Dr. Pritt recommended the petitioner as a consultant knowledgeable in the field of podiatry. Dr. Cain testified that his local Arkansas counsel, Mr. Wilson, withdrew from his case after a death in the family. Following the recommendation of Dr. Pritt, Dr. Cain telephoned the petitioner, and the petitioner stated that "he would handle everything and not to worry, that he had a lot of trial work and was able to do those things out of state."

The petitioner arranged to fly to Joplin, Missouri, and brought his helper, Ron De-Vol. Dr. Cain testified that a fee agreement was reached of $7,000 for the petitioner's services, plus $500 a day and expenses. By letter of July 2, 1979, to Dr.

Cain, Ron DeVol quoted fees for "his office" of $7,500, with $3,000 having been paid, $4,500 due July 9, 1979, plus $500 a day and expenses.

The testimony of William R. Wilson, Jr., an attorney from Little Rock, Arkansas, was that he was retained to represent Dr. Cain in the licensing board proceedings, that he presented the petitioner to the Board as a lawyer from West Virginia and co-counsel, that the petitioner participated in planning strategy and tactics and sat at counsel table, that the source of information that the petitioner was a lawyer came from the petitioner, Dr. Cain and Mr. DeVol, and that mail to the petitioner was sent through Mr. DeVol because the petitioner had been inactive due to a heart condition. Wilson further testified that the petitioner took an active part in the preparation and questioning of expert witnesses.

Mr. Bob Scott, also an attorney in Little Rock, Arkansas, testified that he succeeded Mr. Wilson as attorney for Dr. Cain. The petitioner was presented as being knowledgeable in the field of podiatry. Mr. Scott assumed the petitioner to be a lawyer from West Virginia, based on information from Mr. Wilson or Dr. Cain. At a meeting between Dr. Cain, Scott and the petitioner, Scott inquired of the petitioner why he was not listed in the phone directory as an attorney, and was told by the petitioner that he had been inactive due to health problems. In response to a further inquiry as to why he was not listed in the Martindale-Hubbell legal directory, the petitioner stated that he had been suspended. Scott then told the petitioner that he would have to refund the money paid him by Dr. Cain.

Mr. Scott stated that the petitioner was present with him and Dr. Cain at a hearing before the licensing board, and sat at the table with Mr. Scott and Dr. Cain and discussed evidentiary matters. The question as to the status of the petitioner arose when the petitioner did not want the reporter to list him as co-counsel. Mr. Scott further testified that the petitioner was helpful in preparation of the case, and that the petitioner took the position that he was not acting as a lawyer in the case. However, Mr. Scott knew that Dr. Cain understood the petitioner to be a lawyer.

Based on this and other evidence the Legal Ethics Committee has concluded that the petitioner has failed to carry his burden of proof that he is entitled to the reinstatement of his license to practice law, and unanimously recommends that his petition be denied. The recommendation of the Committee is accorded considerable weight by this Court: "Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Ethics Committee in regard to reinstatement of an attorney are to be given substantial consideration." Syllabus Point 3, *In re Brown, supra.* The petitioner does not claim the Committee made a mistake of law in issuing its recommendations. However, during oral argument he has asserted that the Committee failed to consider the testimony of the numerous character witnesses called on the petitioner's behalf. Included in the character witnesses were business people, leading attorneys and members of the judiciary, public officials and personal friends.

We find no merit in the petitioner's assertion. A review of the Committee's report shows that the Committee fully considered the testimony of the petitioner's character witnesses, and, based on this evidence, found that the petitioner has maintained his study and interest in legal developments and possesses the knowledge and capability of practicing law and representing clients. However, such character testimony is entitled to little weight on the issue of the petitioner's rehabilitation. *See Committee on Legal Ethics v. Pence,* W.Va. 216 S.E.2d 236 (1975); *Committee on Legal Ethics v. Pietranton,* 143 W.Va. 11, 99 S.E.2d 15 (1957). As we have previously stated: "In a proceeding for reinstatement of an attorney's license after annulment general testimony that the petitioner either is or is not of good moral character is entitled to little weight." Syllabus Point 3, in part, *In re Smith, supra.*

From a review of the record before us, we conclude that the petitioner has not borne the burden of showing that he presently possesses the requisite integrity and moral character to resume the practice of law. *See In re Brown, supra; Committee*

*on Legal Ethics v. Pence,* W.Va., 216 S.E.2d 236 (1973). The petitioner has not demonstrated a course of conduct that enables us to conclude that there is little likelihood that he will engage in unprofessional conduct should his license be reinstated. *In re Brown, supra.* On the contrary, we find that reinstatement of the petitioner would result in danger to the public and its finances. *In re Smith, supra.* We have previously noted that "the primary purpose of the Ethics Committee is not punishment but rather the protection of the public and the reassurance of the public as to the reliability and integrity of attorneys." *Committee on Legal Ethics v. Pence,* 161 W.Va. at 246, 240 S.E.2d at 674, *quoting Committee on Legal Ethics v. Mullins,* 159 W.Va. 647, 226 S.E.2d 427, 429 (1976). Consistent with this purpose, we find that on the record before us, the petitioner is not entitled to reinstatement of his license to practice law at this time.[2]

For the foregoing reasons the petition of Richard F. Pence for reinstatement of his license to practice law is denied. The petitioner is ordered to reimburse the Committee for the actual and necessary expenses reasonably incurred by it in connection with this and its previous proceedings.

Petition denied.

**2.** We do not agree with the Ethics Committee that the petitioner should be prohibited from again seeking reinstatement until five years have elapsed from the filing of the petition herein. Such a holding would be in contravention of art. VI, § 35 of the By-Laws of the West Virginia State Bar, which expressly permits the filing of a petition for reinstatement by a person whose license to practice law has been annulled after the expiration of five years from the date of disbarment.