461 S.E.2d 114

**LAWYER DISCIPLINARY
BOARD, Respondent,**

v.

**Richard F. PENCE, a Former Member
of the West Virginia State Bar,
Petitioner.**

No. 22373.

Supreme Court of Appeals of
West Virginia.

Submitted June 27, 1995.

Decided July 19, 1995.

Sherri D. Goodman, Chief Lawyer Disciplinary Counsel, Charleston, for respondent.

Richard F. Pence, pro. se.

PER CURIAM:

This case is before the Court on the petition of Richard F. Pence for reinstatement to the practice of law in West Virginia. We referred this case to the Lawyer Disciplinary Board of The West Virginia State Bar ("the Board") for the development of a record and recommendation. That process has now been completed, and the Board, through a Hearing Panel Subcommittee ("the Subcommittee"), recommends that Mr. Pence be reinstated subject to certain conditions. The chief disciplinary counsel objects to the Subcommittee's recommendation. After considering the record, the briefs, and oral argument, we conclude that reinstatement should be granted, subject to the terms and conditions set forth below.

## I.

The procedural history of this matter is somewhat complicated. In order to simplify the discussion, we will first set forth the matters leading up to Mr. Pence's instant petition for reinstatement. We will then discuss the current procedural posture of the case.

### A. Events Leading Up To the Instant Petition for Reinstatement

Mr. Pence is a sixty-nine-year-old former attorney from Wood County, West Virginia. He has been married for forty-eight years, and he has six children ranging in age from thirty-six to forty-seven years old. He also has nineteen grandchildren.

We originally suspended Mr. Pence's license to practice law for one year, effective July 1, 1975, in *Committee on Legal Ethics v. Pence*, —— W.Va. ——, 216 S.E.2d 236 (1975) ("*Pence I* "). The evidence in that proceeding demonstrated that Mr. Pence had (1) commingled client funds with his own funds; (2) failed to pay over on demand certain client funds; and (3) submitted a misleading exhibit to the West Virginia State Bar's Committee on Legal Ethics ("Ethics Committee" or "Committee") during the course of its investigation. *Id.* at ——, 216 S.E.2d at 241. In addition to suspending Mr. Pence, we ordered him to reimburse the Committee for the expenditures that it incurred in pursuing the matter. *Id.* at ——, 216 S.E.2d at 242. It appears that he has since complied with that obligation.

In October of 1976, Mr. Pence petitioned for reinstatement. *Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668 (1978) ("*Pence II* "). The Ethics Committee performed a preliminary investigation and recommended that reinstatement be denied pending resolution of ten complaints against Mr. Pence that were then before the Committee. Following a hearing, we ordered that Mr. Pence's license be reinstated on July 1, 1977, provided, inter alia, that the

Committee did not seek disciplinary action against Mr. Pence prior to that date. On June 29, 1977, the Committee did pursue such action, alleging that Mr. Pence had engaged in the following misconduct: (1) failing to promptly pay over client funds on demand; (2) commingling client funds with his own funds; (3) engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; (4) intentionally prejudicing a client; (5) knowingly failing to disclose information he was required by law to reveal; (6) knowingly making false representations of fact; (7) counseling and assisting a client in conduct known to be illegal; and (8) knowingly engaging in conduct which was both illegal and contrary to certain disciplinary rules. *Id.* at 242–43, 240 S.E.2d at 669–70. We concluded that the record demonstrated serious ethical violations. Accordingly, we annulled Mr. Pence's license to practice law effective July 1, 1975, and ordered him to reimburse the Committee for all expenses incurred during the proceeding. *Id.* at 253, 240 S.E.2d at 675.

On October 13, 1981, Mr. Pence filed a second petition for reinstatement. *Committee on Legal Ethics v. Pence,* 171 W.Va. 68, 297 S.E.2d 843 (1982) (*"Pence III"*). The Committee performed an extensive investigation to determine Mr. Pence's fitness to practice law. Following a number of hearings on the matter, the Committee found that Mr. Pence had engaged in the unauthorized practice of law during the period in which his license was annulled. As a result, the Committee concluded that Mr. Pence had failed to demonstrate that he had undergone the basic, necessary changes in financial responsibility, personal integrity and trustworthiness required of a practicing attorney. *Id.* at 70, 297 S.E.2d at 845. The Committee further concluded that Mr. Pence's reinstatement would result in a substantial danger to the public and its finances. After reviewing the record, we too concluded that Mr. Pence failed to demonstrate that he should be reinstated. Consequently, we denied the petition for reinstatement and ordered Mr. Pence to reimburse the Committee for the costs and expenses that it incurred during the proceedings.

On August 7, 1985, Mr. Pence filed his third petition for reinstatement. We summarily dismissed that petition when we learned that Mr. Pence had not yet paid the $22,210.52 in costs and expenses that the Committee had incurred during certain prior proceedings. We instructed Mr. Pence that he could not file another petition for reinstatement until he had reimbursed the amount of costs and expenses owing. Mr. Pence has now satisfied this obligation.

## B. Current Procedural Posture

Mr. Pence filed his fourth petition for reinstatement on June 29, 1994. We referred the matter to the Board for an investigation and recommendation. Following a thorough probe into the matter by the Subcommittee that resulted in the development of a voluminous record, the Board issued its decision and recommendation on April 6, 1995. The Board, through its Subcommittee, concluded, inter alia, as follows:

> After a review of all of the evidence presented ... the Subcommittee was of the opinion that Mr. Pence had carried his burden of demonstrating that he was of good moral character and integrity and that he possessed the requisite legal skill to again resume the competent practice of law. Furthermore, the evidence demonstrated that his reinstatement would have no adverse effect on the administration of justice in this State or create harmful public sentiment.

The Board apparently based this decision, at least in part, on the overwhelmingly favorable testimony that was heard. For instance, in addition to concluding that Mr. Pence had been rehabilitated, the Board stated as follows:

> In summary, a vast array of Wood County community members testified in a sincere and forthright manner that Mr. Pence should be reinstated because he had been rehabilitated, had actively participated in community activities for the past ten years and would be an asset to their community as a restored member of the Bar. The Subcommittee found these individuals to be credible and sincere and worthy of belief. The Subcommittee further deter-

mined that the opportunity to observe Mr. Pence by these witnesses on a cumulative basis was significant on the social, business, and community level, and therefore, led to the inescapable conclusion that there was little, if any, adverse information concerning inappropriate conduct by Mr. Pence during this time period.[1]

(Footnote added).

The Subcommittee, however, was somewhat troubled by certain financial transactions that Mr. Pence had engaged in since his disbarment.[2] The Decision and Recommendation states as follows in that regard:

He apparently had suffered serious financial setbacks which resulted in several civil actions being filed against him with several judgments being awarded to individuals with whom he had business relations or from whom he had borrowed money. It is important to note, however, that in all of these transactions, none involved client funds from matters accruing prior to the annulment of his license, but rather, in-. volved personal business transactions which either went awry or were a direct result of his inability to earn a sufficient

income after his disbarment. Mr. Pence gave explanation with regard to these transactions which was believed by the Subcommittee including candid admissions that he had used poor judgement in some of the transactions. This is particularly true with regard to a financial transaction involving industrial revenue bonds which later resulted in a civil suit against Mr. Pence seeking possession of certain real estate. The particulars of this transaction were probed in detail by Disciplinary Counsel and the Subcommittee and although Mr. Pence's answers were not completely elucidating, the Subcommittee is satisfied to term this transaction as puzzling as opposed to inferring that there was some nefarious acts on the part of Mr. Pence.

While the Subcommittee recommended that Mr. Pence's license to practice be reinstated, it imposed the following conditions: (1) that he first pay all of the costs of this proceeding as normally assessed by the State Bar; (2) that he comply with the appropriate continuing legal education requirements prior to reinstatement; (3) that he be super-

---

1. Many witnesses, ranging from ordinary citizens to distinguished circuit judges, testified on Mr. Pence's behalf. These were not mere character witnesses. For instance, many, if not all, of the witnesses had read our decision in *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980), and commented that they believed Mr. Pence should be reinstated based upon the principles enunciated therein. Many of the witnesses also apparently familiarized themselves with the details of the decisions of this Court that dealt with Mr. Pence's prior misconduct.

2. The Subcommittee also felt compelled to schedule an additional hearing on an allegation in a one-page affidavit by an inmate at the Wood County Correctional Center that Mr. Pence had attempted to prevent the inmate from saying anything concerning former Magistrate Ira Atkinson, who was then under investigation by a special grand jury. The Subcommittee held an approximately ten-hour hearing on this matter alone, and heard testimony from, among others, Mr. Pence, the inmate, the inmate's attorney (for whom Mr. Pence was working at the time) and the Prosecuting Attorney for Wood County. This is obviously a matter of grave concern to us. The Subcommittee, however, concluded that there was insufficient evidence that Mr. Pence acted in an improper manner or with an improper motive. We have reviewed the hundreds of

pages of transcript relating to this issue, and we note that disciplinary counsel has not objected to, nor ever even mentioned, the Subcommittee's findings on this question.

The Subcommittee's findings of fact in this context are entitled to "substantial deference." *See* Syl.Pt. 2, in part, *Lawyer Disciplinary Bd. v. Vieweg*, 194 W.Va. at 554, 461 S.E.2d at 60 (quoting Syl. Pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994)). As stated in *McCorkle*,

we realize that the Committee is in a better position than this Court to resolve the factual disputes which may arise in a case. The Committee hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility.

*McCorkle*, 192 W.Va. at 290 and 289, 452 S.E.2d at 381 and 380 ("To ignore these recommendations and conclusions would render the [Subc]ommittee's important adjudicatory role a useless gesture and deprive this Court of the most important benefit of its collective and evaluative judgment.") Given this substantial deference, our detailed review of the record, and perhaps most significantly, the lack of any objections by disciplinary counsel to this portion of the Subcommittee's determination, we cannot say that the Subcommittee's findings of fact on this matter are erroneous.

vised during his first year of reinstatement by an attorney in good standing with the State Bar, subject to the approval of such attorney by the Subcommittee, and that such supervision should be on the following additional conditions: (a) that supervision be on a regular basis and preferably in a work relationship where the supervising attorney would have daily contact with Mr. Pence; (b) that during this first year of reinstatement, Mr. Pence handle all client funds through the trust account of the supervising attorney; (c) that the supervising attorney must agree to provide adequate supervision sufficient to be generally aware of the types and number of cases being handled by Mr. Pence and assure his or her self that Mr. Pence's financial dealings are in proper order; and (d) that the supervising attorney make monthly reports to chief disciplinary counsel attesting that he or she has had sufficient contact and consultation with Mr. Pence during the past month to feel confident in making representations to disciplinary counsel that Mr. Pence has conducted himself in an ethical and proper manner and in accordance with the requirements of the Subcommittee and the reasonable requests of disciplinary counsel.

On April 11, 1995, chief disciplinary counsel Sherri D. Goodman objected to the Subcommittee's recommendation that Mr. Pence be reinstated. In her brief to this Court, disciplinary counsel again points to (1) Mr. Pence's troubling financial transactions, (2) his failure to make restitution to former clients and business partners, and (3) an instance where Mr. Pence allegedly misled a client of a supervising attorney into thinking that the Petitioner was a lawyer. She asserts this conduct is an indication that Mr. Pence (1) has not been rehabilitated, (2) will likely again engage in unprofessional conduct in the future, and (3) will pose a substantial threat of harm to the general public. We will summarize the contentions of disciplin-ary counsel and Mr. Pence on each of these matters below.

## 1. The Frame Matter

This matter was discussed in detail in *Pence III* ten years ago. Disciplinary counsel asserts that Mr. Pence formed a corporation in 1979 to purchase and sell cars in a venture that included Mr. Pence, Jo Ann Frame and her husband, and Mrs. Frame's accountant.[3] Mrs. Frame and her husband contributed $15,000 to the venture and apparently lost everything. No accounting of the money was ever made, but it appears that Mr. Pence may have used it for personal expenses. Mrs. Frame filed an action against the corporation and Mr. Pence in June 1980 to recover the money. On August 21, 1981, Mr. Pence executed a promissory note for $15,000 to the Frames payable January 1, 1982, and the civil action was dismissed. A Mr. Shirley Epling formally guaranteed payment of that note at Mrs. Frame's request. On the same day, Mr. Pence appears to have entered an agreement with Mr. Epling for the latter to pay Mrs. Frame the $15,000. Mr. Pence later apparently delivered a promissory note to Mr. Epling on August 25, 1981, promising to pay Mr. Epling $15,000 on January 15, 1982, in return for Mr. Epling's promise to pay Mrs. Frame on the date prescribed in her promissory note from Mr. Pence.

Mr. Pence apparently did not pay on either note when they came due. Consequently, Mrs. Frame sued Mr. Epling on the note that he had guaranteed, and Mr. Epling in turn joined Mr. Pence as a third-party defendant in the action to recover on his promissory note as well. After Mr. Pence failed to appear, judgment was apparently entered for (1) Mrs. Frame against Mr. Epling for $15,000 plus interest, and (2) Mr. Epling against Mr. Pence for $15,000 plus interest.[4] Mr.

---

**3.** It appears that Mrs. Frame invested the money on the advice of her accountant. Mr. Pence asserts that he was no more than a fellow investor in the failed venture.

**4.** This information was gleaned from a judgment order that was purportedly entered in the Washington County Court of Common Pleas in Marietta, Ohio, which was attached to Mr. Pence's response brief. We will assume that the order was duly entered, but we note that the attachment Mr. Pence has provided us with is signed only by the attorneys for Mr. Epling and Mrs. Frame and not by the presiding judge. Further confusing the issue is hearing exhibit 6. That exhibit is a default judgment order from the Circuit Court of Wood County which was entered on April 20, 1982, against Mr. Pence and in favor

Epling released a judgment against Mr. Pence on October 17, 1991, for what appears to be the amount due and owing him.[5] Mr. Pence asserts that in paying the judgment owed to Mr. Epling, he took the latter's word for the fact that Mrs. Frame had been paid the amount that was due her. Mrs. Frame, however, has apparently never recovered the $15,000 plus interest that she is owed.

## 2. The Boatright Matter

This matter was also discussed in *Pence III*. In essence, Mr. Pence improperly retained $1,696.70 that belonged to Raymond Boatright, a former client. Mr. Pence had apparently assigned a prospective fee to Mr. Boatright to extinguish the obligation and thought that the debt had been paid. Mr. Boatright, however, had not been paid at the time of the hearings in this case. It appears that Mr. Pence has now satisfied the obligation.

## 3. The Matheny Matter

This matter is quite complex, and the record is unfortunately confusing and short on details. Nevertheless, we have attempted to reduce the matter to its essence. Mr. Pence owned and conducted his practice out of a certain building in Parkersburg. In 1977, Mr. Pence requested that his friend Lloyd Matheny loan him the money to pay the outstanding deeds of trust on the property. In return, Mr. Pence conveyed the property to Mr. Matheny, inserted a buy-back provision in the deed, and was to pay rent while he used the building. The rental was secured by deeds of trust on certain property owned by Mr. Pence. Disciplinary counsel asserts that not only did Mr. Pence fail to pay his own rent, but also continued to collect rent from the other tenants in the building for a period of time. Mr. Pence claims

that he gave Mr. Matheny certain antiques in lieu of the rent that was owed. He also asserts that Mr. Matheny consented for a time to Mr. Pence's collection of rent from the other tenants in the building.

In 1986, Mr. Pence proposed a deal to buy back the building for $300,000. The money for the purchase was to come from certain revenue bonds to be issued by the City of Parkersburg. A Mr. Leonard Treister was to purchase the bonds for $300,000, which would in turn be used to pay Mr. Matheny. Mr. Matheny was then to deed the property to Mr. Pence and release certain deeds of trust, including the ones that secured the rent on the building. Mr. Treister was then to hold a new deed of trust on the building. Later in 1986, according to the above-described arrangement, the Mathenys executed a deed to Mr. Pence for the building and delivered releases for the above-noted deeds of trust. In return, Mr. Pence gave Mr. Matheny a check from Mr. Treister for the agreed amount. Mr. Pence then recorded the deed and Mr. Treister's deed of trust. Unfortunately, Mr. Treister's check was returned for insufficient funds in January 1987.

Mr. Pence apparently requested an extension of time to get Mr. Treister to make good on the check and agreed to return the releases and deed the building back to the Mathenys if the money was not forthcoming. On January 14, 1987, the Mathenys filed a civil action to set aside the deed to Mr. Pence and to rescind the releases for the other deeds of trust noted above. Mr. Pence's attorney resisted the lawsuit. While Mr. Pence informally assured Mr. Matheny that the releases would not be recorded prior to full consideration being paid for the property, the releases were recorded on October 7, 1987, in an apparent attempt to forestall a foreclosure

of Mrs. Frame in the amount owing on the promissory note. Mrs. Frame and Mr. Pence appear to have been the only parties to the Wood County action.

5. This is another instance where the record is confusing. The Ohio judgment that we assumed was obtained in favor of Mrs. Frame and Mr. Epling in note four, *supra*, above bore the case number 82M5. The release from Mr. Epling, however, refers to civil action number 82–C–1368 that was rendered in the Circuit Court of

Wood County on September 12, 1983. Apparently, in addition to the Ohio action, Mr. Epling filed a suit bearing number 82–C–1368 in the Circuit Court of Wood County on October 15, 1982, to recover his money. The release indicates that Mr. Epling did finally receive the money owed him. The confusion on this issue is at least in part attributable to the fact that Mr. Epling did not appear at the reinstatement hearings and is assumed to be deceased.

sale on the property under a deed of trust. Mr. Pence vigorously asserts that he was not the one who recorded the releases, but he frankly admits that he wanted to do everything possible to delay the foreclosure and that he likely authorized the action. The Mathenys ultimately obtained judgment on June 15, 1988, and apparently took title to all the properties concerned, including Mr. Pence's residence. Mr. Matheny or his estate was thereafter forced to evict Mr. Pence from his home when he failed to pay rent on the property.[6] Counsel for the Mathenys testified that Mr. Pence had been less than forthright throughout the proceedings. Mr. Pence admitted that this transaction "ended badly" but asserts that he had no nefarious purpose in proposing the deal and attempting to consummate it.[7]

### 4. The Johnson Matter

Dr. William Z. Johnson loaned $20,000 to Mr. Pence, Mr. Pence's son, and another individual. In actuality though, it would probably be more appropriate to characterize Mr. Pence as a guarantor for repayment of the obligation if his son was unable to satisfy the debt. The proceeds were used by the Petitioner's son and his partner to establish a restaurant. Unfortunately, the restaurant failed. Dr. Johnson sued on the obligation on July 6, 1990, and obtained a default judgment shortly thereafter. The money has apparently not yet been repaid. Dr. Johnson was not called as a witness at the hearings, and Mr. Pence even represents that Dr. Johnson extended his best wishes to the Petitioner as late as last month in getting his law license reinstated.

### 5. The Ray Matter

Kitty Ray testified that in June 1994 she contacted the lawyer for whom Mr. Pence was working as a paralegal in order to obtain representation for her son, who was facing criminal charges. Disciplinary counsel alleges that the attorney's secretary arranged for a meeting between Ms. Ray and Mr. Pence, because the attorney employing Mr. Pence was not available. Disciplinary counsel points out that Ms. Ray stated that over the course of a couple of meetings in a one-week period, Mr. Pence never informed her that he was not an attorney. Ms. Ray was apparently under the misconception that Mr. Pence was her lawyer, rather than a mere paralegal.

Mr. Pence asserts that he volunteered the information that he was not a lawyer after two meetings with Ms. Ray. The record bears out this assertion. Further, Ms. Ray readily admitted that Mr. Pence never told her that he was a lawyer. Also, at Mr. Pence's direction, the check that Ms. Ray wrote for her son's attorney fees was made payable to the attorney employing Mr. Pence. There was also testimony to the effect that Mr. Pence always wore jeans and tennis shoes to the office.[8]

## II.

■ Our standard of review for the recommendations of the Lawyer Disciplinary Board in reinstatement cases was recently restated in syllabus point two of *Lawyer Disciplinary Bd. v. Vieweg,* 194 W.Va. 554, 461 S.E.2d 60 (1995).

'A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations

---

6. It appears that the Mathenys eventually sold the properties concerned for $315,000.

7. Disciplinary counsel would likely not disagree with this assertion, given the following exchange at the hearing on November 4:

   CHAIRMAN ROMANO: Let me ask for representation from Bar counsel. Other than the issue about the releases and then the delay in trying to get matters back to status quo when Mr. Treister's check bounced, do you have any

evidence or information that it was other than an up front, legitimate transaction?

   MS. GOODMAN: No, I don't have any evidence.

8. In addition to the judgments discussed in subsections one and four above, Mr. Pence has also apparently not paid two judgments against him from Xerox Corporation and Kesterson's Cleaners dating from 1980 and 1981 respectively.

while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

*Vieweg*, 194 W.Va. at 555, 461 S.E.2d at 61.[9]

■ Our substantive review of this matter is dictated by the well-settled principles contained in *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980). We reiterated those principles in syllabus points three and four of *Vieweg*:

'The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.' Syllabus Point 1, *In Re [re] Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980).

'Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct.' Syllabus Point 2, *In Re [re] Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980).

Syl.Pts. 3 and 4, *Vieweg*, 194 W.Va. at 555, 461 S.E.2d at 61.

■ We must first determine whether Mr. Pence presently possesses the legal competence, integrity and moral character to resume the practice of law. There is no indication that Mr. Pence has not maintained the legal acumen that once made him "one of the outstanding trial lawyers in Wood County...." *Pence I*, —— W.Va. at ——, 216 S.E.2d at 239. For instance, Mr. Pence adduced the following testimony from attorney Ralph Troisi, for whom Mr. Pence had performed legal research:

On a regular basis, I get little notes from you with cases attached to them telling me that I should read this case or that case, which makes it obvious to me that you're reading the advancement [sic] sheets and keeping an eye out, at least in my case, for matters that deal with personal injury cases; and sometimes you send me some notes on criminal cases, because I have done some criminal work in the past.

The issue of Mr. Pence's integrity, moral character and rehabilitation is more difficult. The matters outlined by disciplinary counsel regarding the judgments obtained against Mr. Pence and some of his business and financial activities in years past are very troubling, especially the Matheny matter.

Based on our independent review of the record, however, we tend to agree with the Subcommittee that these matters related more to a combination of bad business judgment and a limited income rather than any sinister intent. While lack of sufficient income is certainly no excuse for Mr. Pence's failure to pay his prior debts,[10] an honest inability to pay mitigates the matter much more than would a dishonest and unjustified refusal to pay. As will be discussed further herein, we think our directive for payment of these few outstanding judgments, the additional strict conditions we have imposed on Mr. Pence's reinstatement, and the lapse of time that has occurred between the events described above and the current petition for

---

9. While the above-quoted syllabus point refers to the former Committee on Legal Ethics, we noted in *Vieweg* that the applicable standard of review "is the same under the new Rules of Lawyer Disciplinary Procedure as it was with regard to the former Committee on Legal Ethics." *Vieweg*, 194 W.Va. at 558, 461 S.E.2d at 64.

10. Certainly even a person of limited income should at least make an effort to pay down a portion of his or her outstanding debts.

reinstatement adequately resolve our concerns in this area at this time.

Further, we cannot look at the matters raised by disciplinary counsel in a vacuum to determine the presence of integrity and rehabilitation. Even before our directive in this opinion requiring Mr. Pence to pay his outstanding judgments, he stated at oral argument that he had a "moral obligation" to pay the debts, and would do so when financially able, even if some of the debts are now barred by the statute of limitations. Further, Mr. Pence's course of conduct as a whole over the past five years weighs very heavily in concluding that rehabilitation has occurred.

For instance, in addition to other community service, Mr. Pence has (1) been very active in his church and served a three-year term as a church council member; (2) been appointed and reappointed to represent the Wood County Commission as its representative on the Western District Guidance Center Board of Directors, which performs various social services and administers a large budget; (3) been appointed by the Wood County Commission to serve as a member of the Wood County Commission on Crime Delinquency and Correction; (4) been appointed by the City of Parkersburg to serve on the City's three-member Building Commission; and (5) volunteered and served as a teacher and instructor in a literacy program.

Several of the above activities have imposed great fiscal responsibility on Mr. Pence, and there is no indication that he has acted in anything other than trustworthy fashion with regard to this responsibility. For instance, the Director of the Western District Guidance Center testified as follows:

> During the past year our operating budget exceeded twelve million dollars....
>
> During his Presidency, Mr. Pence and I have worked very closely together and have had a very productive and effective relationship....
>
> One of Mr. Pence's major accomplishments as a board member has been to organize activities designed to orient and train board members to perform their duties as members of a non-profit board; and in particular, to be cognizant of their fiduciary responsibilities.

We are also mindful of Mr. Pence's stated personal remorse, embarrassment and shame for the conduct that led to disciplinary action being taken against him. After carefully reviewing the record and the Petitioner's course of conduct, we think that there is little likelihood that he will again engage in professional malfeasance. This is especially so given his age, the strict conditions we impose on his practice, and the further disgrace and humiliation that such misconduct would visit on both himself and his family.

In regard to the reinstatement's effect on public confidence in the administration of justice, we find it particularly noteworthy that those public officials who are charged with governing the community that Mr. Pence lives in have seen fit to appoint him to several important public positions. Further, several members of the general public, as well as distinguished public servants, including members of the judiciary, testified that there would be little or no negative public perception if reinstatement was ordered. While we are mindful of the serious nature of Mr. Pence's prior misconduct, we agree with the Subcommittee that, on balance, there is no danger that this reinstatement will have a justifiable and substantial adverse effect on the public confidence in the administration of justice. To the contrary, based in part on (1) the testimony at Mr. Pence's hearing, (2) the fact that he has been disbarred for nearly twenty years, and (3) his undeniable and sustained commitment to serving his community in the recent past, we think the public perception of reinstatement will be largely, if not uniformly, positive.

After very careful consideration of the briefs, the record and oral argument, we conclude that reinstatement is appropriate. The reinstatement will be effective January 1, 1996. In order to assure maintenance of the high standards of the Bar in this State,[11] however, we attach the following conditions to Mr. Pence's reinstatement:

---

11. See *Vieweg*, 194 W.Va. at 560, 461 S.E.2d at 66.

1. The Petitioner must pay all costs of this proceeding as normally assessed by the State Bar;

2. The Petitioner must comply with the appropriate continuing legal education requirements prior to reinstatement;

3. The Petitioner must satisfy all of the outstanding judgments that have been rendered against him. Payment of the obligations may be made either (1) in a lump sum prior to reinstatement, or (2) according to a reasonable payment schedule of no more than seven years from the date of reinstatement, as agreed upon by the State Bar and the Petitioner;

4. The Petitioner, for a five-year period dating from the time of reinstatement, must report all current and future personal and business loans to disciplinary counsel, who will periodically track the status of such obligations with the Petitioner's assistance;

5. The Petitioner must be supervised during his first two years of reinstatement by an attorney in good standing with the State Bar, subject to the approval of such attorney by the Subcommittee.[12] This supervision is subject to the following additional conditions (a) that supervision be on a regular basis and preferably in a work relationship where the supervising attorney would have daily contact with the Petitioner; (b) that during the two-year supervision period, Petitioner must handle all client funds through the trust account of the supervising attorney; (c) that the supervising attorney must agree to provide adequate supervision sufficient to be generally aware of the types and number of cases being handled by the Petitioner and assure his or herself that the Petitioner's financial dealings are in proper order; (d) that the supervising attorney make monthly reports to chief disciplinary counsel attesting that he or she has had sufficient contact and consultation with Mr. Pence during the past month to feel confident in making representations to disciplinary counsel that the Petitioner has conducted himself in an ethical and proper manner and in accordance with the requirements of the Subcommittee and the reasonable requests of disciplinary counsel.

This case is remanded to the Lawyer Disciplinary Board for proceedings consistent with this opinion.[13]

Reinstatement as of January 1, 1996; Payment of Costs of This Proceeding as Normally Assessed; Satisfaction of Continuing Legal Education Requirements; Two Years Supervised Practice; Payment of Outstanding Judgments; Disclosure of Current and Future Personal and Business Loans to Disciplinary Counsel for a Five–Year Term with Periodic Monitoring of Debt Service by the Latter; and State Bar to Monitor Practice As More Particularly Described Herein.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

---

12. The supervisor and supervisee would do well to take their respective obligations seriously. Regarding the supervisor, we have stated that "[n]on-compliance by the supervising attorney shall be considered a breach of professional responsibility." *Committee on Legal Ethics v. Farber*, 191 W.Va. 667, 670, 447 S.E.2d 602, 605 (1994). As for the supervisee, we stated in *Farber* that, "[i]n the future, when confronted with noncompliance with supervision requirements, the Court will likely suspend absolutely, or annul, the law license of an attorney who fails to comply with the requirements." *Id.* at 670, 447 S.E.2d at 605 n. 2.

13. There is an additional matter that we feel compelled to address briefly. We are fully cognizant of the misconduct that occasioned Mr. Pence's suspension and disbarment and his outstanding financial obligations. Disciplinary counsel, therefore, should be particularly diligent in policing subsequent developments in this matter. Should disciplinary counsel discover that Mr. Pence is engaging in prohibited conduct, not complying with any of the conditions, or should additional details be discovered relating to the alleged serious misconduct discussed herein at footnote two, a petition for emergency temporary suspension should be filed pursuant to West Virginia Rule of Lawyer Disciplinary Procedure 3.27.