518 S.E.2d 101

**LAWYER DISCIPLINARY BOARD, Complainant,**

v.

**Richard E. HARDISON, a Member of the West Virginia State Bar, Respondent.**

No. 22430.

Supreme Court of Appeals of West Virginia.

Submitted May 4, 1999.

Decided July 9, 1999.

Steven Johnston Knopp, Esq., Lawyer Disciplinary Counsel, Charleston, West Virginia, Attorney for the Complainant.

Richard E. Hardison, Pro Se.

## PER CURIAM:

This case involves a lawyer disciplinary matter. At the hearing held by a Hearing Panel Subcommittee of the Lawyer Disciplinary Board (Board), seven complainants testified for the Office of Disciplinary Counsel (ODC). Each of these complainants, Teresa Tessaro, Sylvia Moore, Grant C. Bailey, Alice Matherly, Charles M. Evans, D.C., Michael Orra, M.D., and David L. Shamblin, M.D. were clients, former clients or doctors of clients or former clients of Respondent, Rich-

ard E. Hardison. Their cases will be summarized below. On November 19, 1998, the Board filed with this Court its findings of fact, conclusions of law and recommendations regarding these complaints. Both Hardison and the ODC objected to the disposition of the formal charge recommended by the Board. The matter was then set for hearing.

Hardison was admitted to the West Virginia State Bar on May 14, 1971. He is currently an inactive member of the bar, having voluntarily placed himself on inactive status on December 16, 1996. He practices from his office in Beckley, Raleigh County, West Virginia.

## I.

## REVIEW OF CASES

### 1. Teresa G. Tessaro

Ms. Tessaro, as mother and next friend of Vernon T. Tessaro, retained Hardison and his associate to represent them for injuries arising out of an accident Vernon suffered at a church near his home. The lawsuit settled and the church's insurer paid the sum of $8,009.54 from which certain disbursements, including medical bills and litigation expenses, were to be subtracted. On May 29, 1992, a final order was entered by the circuit court approving the settlement. Dr. Syed Zahir submitted medical bills in the amount of $3,037.60 and Dr. E.H. Isaacs submitted medical bills in the amount of $750.00. Hardison and Ms. Tessaro agreed that Hardison would attempt to negotiate a fee reduction from the two doctors in an effort to maximize the amount of recovery Vernon would receive. The hospital and Dr. Isaacs reduced their bills; however, Dr. Zahir declined to do so. Hardison failed to timely pay the medical bills or to disburse the remaining funds. Ms. Tessaro filed an ethics complaint on February 15, 1994. Hardison paid Dr. Zahir on March 17, 1994 and later paid Dr. Isaacs. The remainder of the funds was released to Ms. Tessaro on June 16, 1994.

The Board concluded that the delay for a period of more than two years in disbursing the proceeds of the settlement balance to the client and the medical providers violated Rule 1.3 (Diligence) and Rule 1.15(b) (Safe-keeping property) of the Rules of Professional Conduct. Rule 1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Rule 1.15(b) states:

> (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

The ODC does not contest this finding.

### 2. Sylvia Moore

Sylvia Moore retained Hardison in 1988 to represent her in a medical malpractice action, involving a missed diagnosis of three brain aneurysms. Hardison delayed filing the claim until April 26, 1990. The defendant doctors were dismissed with prejudice because of Hardison's failure to answer discovery. Hardison testified before the Board that he was unable to find a medical expert who would testify on Ms. Moore's behalf. When Hardison consented to the dismissal of the malpractice action in 1992, he was given leave to file a memorandum within two weeks to persuade the court to permit him to amend the complaint against the hospital for wrongful discharge (the hospital was also Ms. Moore's employer). Neither the memorandum nor any amended pleadings were filed. His client was not informed he had not filed a wrongful discharge action against the employer.

On May 2, 1994, Ms. Moore notified Hardison that she wanted to pick up her file on May 13, 1994 at 1:00 p.m. Ms. Moore traveled from Summersville to Beckley on that date, and when she arrived at Hardison's office, she was told the file was not ready, but it would be sent to her in portions as it was copied. On May 15, 1994, Ms. Moore wrote to the West Virginia State Bar concerning the matter. On June 1, 1994, Hardi-

son represented to disciplinary counsel that he had hired temporary help to make copies of the file and would make arrangements to send it to Ms. Moore. Hardison finally mailed Ms. Moore her file on July 14, 1994.

The Board concluded Hardison violated Rule 1.4(a) (Communication) and Rule 1.16(d) (Declining or terminating representation) of the Rules of Professional Conduct. Rule 1.4(a) states, "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." Rule 1.16 states:

> (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

The ODC does not contest this finding.

3. Grant Bailey

On October 12, 1989, Mr. Bailey underwent back surgery after an on-the-job injury damaged two intervertebral discs. Due to a mislabeled X-ray, the surgeon operated on the wrong disc. A second operation was required. Mr. Bailey met with Hardison and provided him with his medical records and the report of an expert on November 29, 1990. Thereafter, Mr. Bailey contacted or attempted to contact Hardison's office on numerous occasions without success. Twice he spoke with someone at the office but received no information regarding his case; on other occasions, his calls were not returned. On November 7, 1991, Hardison filed a complaint in circuit court which he did not share with his client. On November 20, 1991, Hardison sent Mr. Bailey a copy of the complaint and a letter to notify him that the lawsuit had been filed. Upon reviewing the complaint, Mr. Bailey determined Hardison sued the wrong radiologist and the wrong corporation. The court dismissed the two medical providers from the action, and the

case was lost to the statute of limitations on the amended complaint against the proper doctors. Hardison failed to timely appeal.

The Panel concluded Hardison violated Rule 1.3 (Diligence) and Rule 1.4(a) (Communication) of the Rules of Professional Conduct.[1] The ODC does not contest this finding.

4. The Ewell Hatfield Estate

Claims were made against the estate of Ewell Hatfield, and Hardison represented the administratrix of the estate. A trial date was scheduled for May 2, 1994 in the Circuit Court of Mingo County, West Virginia. On that day, Hardison called the judge and stated that his car had broken down. Disciplinary counsel believed that Hardison also said he would obtain a replacement vehicle. Later, after setting out in the replacement vehicle, disciplinary counsel believed Hardison called the court to say he could not make an appearance because he had been stopped for speeding. The court granted default judgment against the estate on the complaint and a cross complaint.

A complaint was filed against Hardison, but no witnesses were located to support the allegation that Hardison had called to advise the court that he would obtain another vehicle or that he was stopped for speeding. Hardison under oath denied making such representations to the court. The Board determined there was insufficient evidence to support the charge that Hardison had violated Rule 8.4(c) (Misconduct) or Rule 8.4(d) of the Rules of Professional Conduct, which read as follows:

> It is professional misconduct for a lawyer to:

> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

> (d) engage in conduct that is prejudicial to the administration of justice[.]

The Panel recommended dismissal of the charges and the ODC does not contest this finding.

1. These rules were quoted earlier in this opinion.

### 5. Alice Matherly

On April 26, 1992, Ms. Matherly retained Hardison to pursue a products liability claim against Dow Corning as the manufacturer of silicone implants, and Dr. Fred Pulido, the doctor who performed her implant surgery. Hardison assured Ms. Matherly the complaint had been filed. She met with him on August 8, 1994, at which time she asked for proof of filing. Hardison responded he would provide proof within one week; Ms. Matherly set a deadline of August 15, 1994. The lawsuit was finally filed on August 12, 1994. By letter dated August 15, 1994, Ms. Matherly discharged Hardison and demanded the return of her files. On October 21, 1994, Hardison sent Ms. Matherly's file to her new attorney. Ms. Matherly ultimately received a portion of a second global settlement from the Dow Corning lawsuits, but contends that if her complaint had been filed timely, she would have obtained a larger settlement from the first global settlement. However, no evidence was submitted to support this contention.

Hardison refutes that he was retained by Ms. Matherly on April 26, 1992, in that he does not agree to represent anybody in a product liability and/or a medical malpractice action until it is determined there is a valid cause of action. He states that Ms. Matherly did not discover until 1992 that actions were being filed with respect to silicone breast implants, and the statute of limitations, at least five years, would not run for some time. The liability and venue issues of the litigation were complicated, therefore, it took time to file the complaint. He claims Ms. Matherly was never told her case was filed prior to his meeting with her on August 8, 1994. He claims his paralegal told him the suit had been filed at that time; he shared this information with Ms. Matherly and provided her with a draft of the complaint. Ms. Matherly called him that day or the next day to inform him her lawsuit was not of record. The complaint was filed on August 12, 1994. Regarding the delay in delivering her file to her new attorney, Hardison claims logistical problems. He contends the file was delivered prior to the filing of the ethics complaint. He states there is no evidence to support Ms. Matherly's allegation that she would have received more money if she had settled earlier.

Hardison was charged with a violation of Rule 1.3 (Diligence), Rule 1.15(b) (Safekeeping property) and Rule 8.4(c) (Misconduct). The Panel found no violation of the rules and recommended dismissal of the charges. ODC contests this finding as it relates to Rule 1.3 and Rule 1.15(b).

### 6. Charles Evans, D.C.

Hardison represented one of Dr. Evans' patients, Mrs. Jennings, in a personal injury action. Mrs. Jennings and Hardison signed a doctor's lien, which gave Dr. Evans a lien for medical fees on any settlement arising from the accident. Dr. Evans billed for services in the amount of $225.50. However, when Hardison sent Dr. Evans a check on June 5, 1995, it was for the amount of $150.33, which represented payment in full "less 33⅓ attorney fee for collecting said amount." Dr. Evans requested complete payment of the bill. Hardison ultimately paid the $75.00 originally withheld. By letter dated July 11, 1995, disciplinary counsel requested that Hardison respond to Dr. Evans' complaint, which he failed to do.

Hardison states that it was his practice to give his clients the 33⅓ percent withheld from the doctors' fees as a collection fee, which he did in this case. He was of the opinion that he could charge for collecting monies for medical providers. Nonetheless, he paid Dr. Evans the $75.00.

The Board found the initial withholding of a portion of Dr. Evans' fees was inappropriate, but Hardison ultimately paid the entire fee and his conduct did not rise to the level of a violation of Rule 1.15(b) (Safekeeping property), Rule 4.1(a) (Truthfulness in statements to others) or Rule 8.1(b) (Bar admission and disciplinary matters) of the Rules of Professional Conduct. Rule 4.1(a) states, "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person[.]" Rule 8.1(b) states:

[A] lawyer . . . in connection with a disciplinary matter, shall not:

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

The Board recommended dismissal of these charges. ODC contests this finding.

### 7. Michael Orra, M.D.

Hardison was retained by Amy Peyton to represent her in a personal injury action. He gave Mrs. Peyton a general letter of protection dated February 28, 1987, which stated that "this is to advise that upon settlement of this matter I will see to it that Mrs. Peyton covers your fee out of the proceeds of the settlement." Hardison requested a release of medical records and an itemized statement from Dr. Orra, Mrs. Peyton's treating physician. Dr. Orra sent Hardison an assignment giving the doctor a lien on any proceeds from the settlement. Hardison and Mrs. Peyton signed the document and returned it to Dr. Orra. Dr. Orra forwarded an itemized statement for treatment, reflecting fees of $9,105.00. Mrs. Peyton died. Hardison settled the case, retained his fee and paid the proceeds to Mrs. Peyton's husband. As Mr. Peyton disputed Dr. Orra's fee, Hardison gave no notice of the settlement to Dr. Orra nor did he place the disputed amount in escrow. After learning of the settlement, Dr. Orra retained counsel to assist him in collecting the fees and filed an ethics complaint against Hardison. In 1997, Hardison paid Dr. Orra from his own funds.

Stating that Dr. Orra was using the ethics process as a debt collection procedure, the Board found no violation of Rule 1.5(a) (Fees) or Rule 8.4(c) (Misconduct) of the Rules of Professional Conduct. Rule 1.5(a) states:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

ODC contests this finding.

### 8. David Shamblin, M.D.

Dr. Shamblin, an orthopedic surgeon, treated Paula Kidd Sweeney for injuries she received in an automobile accident. Hardison's associate wrote to Dr. Shamblin on May 18, 1992, stating that he represented Ms. Sweeney with respect to the injuries. The letter stated that Hardison was negotiating a settlement with the insurance company, and he requested that Dr. Shamblin withhold collection proceedings until Ms. Sweeney collected a settlement on the matter. Dr. Shamblin submitted his bill. With a letter dated July 14, 1993, Hardison enclosed a check to Dr. Shamblin in the amount of $1,098.40 stating that amount represented payment in full, less 33⅓ percent for attorney's fees for collecting said amount. When questioned by disciplinary counsel regarding the reduction of the doctor's fee, Hardison explained that he intended to ask Dr. Shamblin to reduce his fee. This he apparently did not do, but agreed he would contact Dr. Shamblin regarding the medical fee. Dr. Shamblin never received the amount withheld.

Hardison admits he deducted 33⅓ percent from the doctor's fees for collecting the money. He states that he explained to Dr. Shamblin's office manager that he had reduced his attorney fee and requested that Dr. Shamblin reduce his fee in light of the

reduced amount of the settlement. He once again gave the money to the client. Hardison explains that he met with Disciplinary Counsel in December 1993. At that time, Disciplinary Counsel informed him that Dr. Shamblin's office wanted to cash the check Hardison had previously sent them and that would be the end of the matter.

The Board determined that even though it was inappropriate for Hardison to withhold a portion of the doctor's fee from the proceeds of the client settlement, there was insufficient evidence to conclude Hardison violated Rule 4.1(a) (Truthfulness in statements to others) of the Rules of Professional Conduct. ODC contests this finding.

The Board heard testimony from Hardison regarding his long and difficult history with alcoholism. Hardison told the Board that he has in the past participated in a number of inpatient programs for the treatment of alcoholism and for a cross-addiction to pain pills. In November 1996, he was the subject of an involuntary commitment at Huntington State Hospital following an incident in which police were called to his home. Hardison also treated with Dr. Lee Neilan (deceased), a Charleston psychiatrist, on a monthly basis and attended Alcoholics Anonymous meetings on average four times per week. He takes Antabuse for alcohol addiction and Naltrexone for narcotic addiction. He clearly has diligently and aggressively attempted to deal with his problem.

The Board noted that on December 16, 1996, Hardison voluntarily entered inactive status with the West Virginia State Bar; his agreement with the State Bar provided that he would refrain from practice during the pendency of these charges and that he would refrain from abuse of alcohol and drugs. Hardison admits that subsequent to the agreement he relapsed three times, but stated at the May 11, 1998 hearing that he had been drug and alcohol free for six months.

Hardison testified that his problems with alcohol were not a contributing factor to any of his conduct which gave rise to the various ethics complaints filed against him. The Board, nonetheless, believes Hardison's involuntary alcohol addiction most likely contributed to his conduct and his return to the practice of law should involve continuing treatment for his addictions. The Board recommends the following sanctions: suspension for ninety days (prior inactive status should not be deemed as credit); refrain from consumption of alcohol and controlled substances to be supported by medical evidence obtained at his expense in the form of periodic drug and alcohol screening; continue counseling and participation in Alcoholics Anonymous; upon reinstatement, be supervised in the practice of law for eighteen months; upon reinstatement, maintain malpractice liability insurance not less than $500,000.00; satisfy all requirements of the mandatory Continuing Legal Education Commission for the current period; complete the Multistate Professional Responsibility Examination with a passing score within twelve months immediately following reinstatement; pay all the costs of these proceedings, except costs which can be specifically identified as relating to those counts, if any, which are dismissed.

## II.

## STANDARD OF REVIEW

■■■ " 'A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994)." Syllabus Point 2, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995).

Syllabus Point 3, *Lawyer Disciplinary Bd. v. Cunningham*, 195 W.Va. 27, 464 S.E.2d 181 (1995).

## III.

## DISCUSSION

█ The gravamen of the complaints against Hardison shows a pattern of neglect or inattention to the needs of his clients, lack of communication with clients, and failure to pursue his clients' cases and meet deadlines. He also claimed attorney fees for collecting debts for doctors whose fees he guaranteed. As far as we can tell, all of the cases from which these charges originate have been resolved and there is no allegation that any of the doctors involved are owed any money.

█ The Board and ODC believe that Hardison's problems in the daily operation of his law practice are due to alcoholism and drug addiction. In his brief to this Court, Hardison states that "he did not ever desire to be an alcoholic[.]" This Court is convinced that Hardison's problems stem from his alcoholism and drug addiction. We also believe this is an illness he did not ask for, does not want and cannot control. An alcoholic does not want to suffer from alcoholism any more than a cancer patient wants to suffer from cancer. The paramount consideration for us now is protection of potential clients and the public. "The principle purpose of attorney disciplinary proceedings is to safeguard the public's interest in the administration of justice." Syllabus Point 3, *Daily Gazette v. Committee on Legal Ethics,* 174 W.Va. 359, 326 S.E.2d 705 (1984).

For many years alcoholics were viewed as morally defective individuals who were subject to scorn and pity but who were not seen as suffering from a disease. This Court noted on a previous occasion that "[a]lcoholism and alcohol dependency is generally recognized as a disease which requires treatment or some form of therapy." *Frasher v. West Virginia Bd. of Law Examiners,* 185 W.Va. 725, 733, 408 S.E.2d 675, 683 (1991) (citations omitted). We subscribe to the modern view that alcoholism is an illness. Alcoholism is defined as

a primary, chronic disease with genetic, psychosocial, and environmental factors influencing its development and manifestations. The disease is often progressive and fatal. It is characterized by impaired control over drinking, preoccupation with the drug alcohol, use of alcohol despite adverse consequences, and distortions in thinking, mostly denial. Each of these symptoms may be continuous or periodic.

Roger E. Meyer, *The Disease Called Addiction: Emerging Evidence in a 200-year Debate,* The Lancet, Jan. 20, 1996, at 162.

It is commonly recognized that treatment for alcoholism begins with recognition of the problem. During detoxification the alcohol withdrawal syndrome produces such unpleasant manifestations as depression, anxiety, emotional discomfort (i.e., dysphoria), hallucinations and seizures. Despite suffering through these unpleasant manifestations, relapse is a dreaded but common event. Relapse simply means a return to drinking after detoxification. Once relapse occurs, the general clinical consensus is that physiological dependence is reinstated rapidly. John Littleton, M.D., Ph.D., *Neurochemical Mechanisms Underlying Alcohol Withdrawal,* Alcohol Health & Research World, Winter 1998 vol. 22 no. 1, at 13.

Hardison recognizes he has a problem with alcohol dependency and has actively sought treatment. He has struggled valiantly against the addiction and has been hospitalized in inpatient programs, sought counseling, attended Alcoholics Anonymous, and is on drug therapy. Nonetheless, despite desperate resistance he continues to suffer from relapses. It is imminently clear to this Court that he cannot practice law at this time because of his impairment; we are not satisfied that he has fully recovered and has overcome the relapse problem so that he can competently practice his profession. The Board believes, as does this Court, that Hardison possesses considerable legal ability, and in the future will be a credit to the legal system if he can only control his alcohol addiction and take the steps to prevent relapses and recurrences of the conduct which gave rise to these complaints.

█ We understand that Mr. Hardison suffers from a disease not of his choosing and it our desire that he be rehabilitated so he can resume his practice; not that he be disbarred. We also understand that "[t]his

Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Committee on Legal Ethics v. Blair,* 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985).

In light of the problems he has encountered in the practice of law due to persistent alcohol addiction, this Court imposes the following sanctions:

1. Mr. Hardison's license to practice law in West Virginia is suspended indefinitely, with leave to petition for reinstatement to practice upon the completion of one year of sobriety and complete abstinence from consumption of alcohol and controlled substances. This period of abstinence must be supported by medical evidence, obtained at his own expense, in the form of periodic drug and alcohol screenings and the expert opinion of treating and consulting physicians;

2. Mr. Hardison will continue counseling and participation in Alcoholics Anonymous as directed by his physician(s);

3. Mr. Hardison will satisfy all the requirements of the Mandatory Continuing Legal Education Commission for the current period;

4. Mr. Hardison will complete an additional fifteen hours of continuing legal education credits in the area of office management;

5. Following reinstatement, Mr. Hardison will practice under supervision for a period of one year;

6. Following reinstatement, Mr. Hardison will maintain in full force and effect a policy of malpractice insurance with limits of liability not less than $500,000.00. He will annually provide evidence to the ODC that his liability insurance continues to be in effect.

7. Mr. Hardison will pay all the costs incurred in the investigation and hearing of this matter.

Suspension of license with conditions.

Justices WORKMAN and DAVIS, deeming themselves disqualified, did not participate in the decision in this case.