IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 12-0677

_____

**FILED**

**June 18, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: PETITION FOR REINSTATEMENT OF L. DANTE DITRAPANO

_____

Lawyer Disciplinary Proceeding

PETITION FOR REINSTATEMENT DENIED

_____

Submitted: January 28, 2014
Filed: June 18, 2014

Robert H. Davis, Jr., Esq.                    Rachael L. Fletcher Cipoletti, Esq.
Harrisburg, Pennsylvania                      Joanne M. Vella Kirby, Esq.
Counsel for the Petitioner                    Office of Disciplinary Counsel
                                              Charleston, West Virginia
                                              Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

JUSTICE WORKMAN and JUSTICE LOUGHRY concur and reserve the right to file separate opinions.

JUSTICE KETCHUM dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabilitation. In addition, the court must conclude that such

i

reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." Syl. pt. 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

4.      "Detaining money collected in a professional or fiduciary capacity without bona fide claim coupled with acts of dishonesty, fraud, deceit or misrepresentation justify annulment of an attorney's license to practice law." Syl. pt. 5, *Committee on Legal Ethics v. Pence*, 161 W. Va. 240, 240 S.E.2d 668 (1977).

5.      "This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment." Syl. pt. 5, in part, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

6.      "Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." Syl. pt. 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

Per Curiam:

This case is before the Court upon the June 1, 2012, petition of L. Dante DiTrapano for reinstatement of his license to practice law. The Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board ("LDB") conducted a hearing on Mr. DiTrapano's petition on March 27, 2013, and April 17, 2013. Based upon the record developed through testimony and evidence presented during the hearing, the HPS created a report on October 17, 2013, containing its recommendation regarding Mr. DiTrapano's petition. In that report, the HPS recommended to this Court that Mr. DiTrapano's license be reinstated following the successful completion and termination of his federal sentence of supervised release, which is expected to occur on January 14, 2015, along with the following conditions: (1) that his legal practice be supervised by his employer or another supervisor and by the director of the West Virginia Lawyer Assistance Program ("WVLAP") for two years following his reinstatement; (2) that prior to reinstatement, he be required to pay his dues to the West Virginia State Bar and complete all required CLEs; (3) that he be ordered to reimburse the LDB the costs of the reinstatement proceedings; (4) that he be ordered to continue his attendance at Alcoholics Anonymous and Narcotics Anonymous meetings three to four times per week; (5) that he remain a member of the WVLAP for a period of two years from the date of reinstatement and that he be available upon request to assist the Board of Directors in speaking to bar members who struggle with alcoholism and/or addiction; and (6) that he give random

1

urine screens, at his expense, to the WVLAP for a period of two years from reinstatement.

We have thoroughly reviewed the record presented for consideration, the briefs, the legal authorities cited, and the arguments of Mr. DiTrapano and the Office of Disciplinary Counsel ("ODC"). While Mr. DiTrapano has made commendable efforts to deal with his substance abuse problem, our review and consideration are not limited only to Mr. DiTrapano's abuse of intoxicating substances. Pursuant to our review of the entire record, we find that Mr. DiTrapano has not satisfied his burden of showing that he presently possesses the integrity and moral character to resume the practice of law. Therefore, we decline to reinstate Mr. DiTrapano's law license.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Federal Felony Convictions and Disbarment

The petitioner, L. Dante DiTrapano, is a native of Charleston, West Virginia. He began abusing illegal drugs as a teenager, which continued into his years as an undergraduate student. While in his early twenties, Mr. DiTrapano was arrested several times in connection with his possession of illegal drugs and for driving under the influence. He eventually sought in-patient treatment for addiction in 1988, citing February 22, 1989, as the date on which he became clean and sober.

2

Mr. DiTrapano avers that he did not engage in any form of substance abuse for approximately fifteen years thereafter. During that time, he completed his undergraduate studies and obtained a law degree from John Marshall Law School in Atlanta, Georgia, graduating summa cum laude. Subsequently, he was admitted to the bar in both West Virginia and Georgia. Mr. DiTrapano returned home to Charleston, West Virginia, and went to work at his father's law firm, DiTrapano, Barrett & DiPiero. While working at the firm, Mr. DiTrapano avers that he did not regularly attend twelve-step meetings[1] or remain focused on his sobriety because he became overconfident with his sobriety and was frequently traveling for work.

In 2004, Mr. DiTrapano developed a cough with chest pain and wheezing. A doctor prescribed to him a cough syrup containing hydrocodone. Mr. DiTrapano said he did not inform the doctor of his history of substance abuse and that he knew he should not have taken the medicine. He quickly became addicted to the cough syrup and abused it for the next year. He then began acquiring and abusing oxycodone. Mr. DiTrapano progressed on to smoking crack cocaine, stating that his drug use "spun out of control"

---

[1] The "twelve-step program" was first described in *Alcoholics Anonymous: The Story of How Many Thousands of Men and Women Have Recovered from Alcoholism* by Bill W. in 1939. Among other things, the twelve steps include requiring the addict to admit powerlessness, to make a personal moral inventory, to promptly admit wrongs, to admit the exact nature of his or her wrongs, and to make amends for those wrongs. Alcoholics Anonymous and other addiction recovery groups employ this twelve-step program.

after a six-year-old child, a friend of one of his children, accidently drowned in the DiTrapano family swimming pool.

In early 2006, Mr. DiTrapano's family encouraged him to enter a drug rehabilitation program. He traveled to Florida for treatment, but before he began treatment he engaged in additional drug use, leading to his arrest in Florida on March 14, 2006, for possession of cocaine. On April 6, 2006, a federal search warrant was executed on his home in Charleston, West Virginia. Among the items seized were several loaded firearms, ammunition, and crack cocaine. Mr. DiTrapano was arrested again on April 24, 2006, in Georgia and charged with driving on a suspended license and possession of cocaine. He was arrested again on June 11, 2006, in South Charleston, West Virginia, for driving on a suspended license, having no insurance, having an expired registration, and having an expired inspection sticker.

On June 14, 2006, Mr. DiTrapano was indicted in the United States District Court for the Southern District of West Virginia on two separate felony counts. Count One charged him with knowingly possessing various firearms in and affecting interstate commerce while being an unlawful user of and addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3) (2005) and 18 U.S.C. § 924(a)(2) (2005). Count Two charged him with knowingly making a false statement and representation to a licensed dealer of firearms regarding his dependence on a controlled substance in violation of 18

4

U.S.C. § 924(a)(1)(A). Mr. DiTrapano was arrested in Charleston, West Virginia, on June 15, 2006, pursuant to a federal arrest warrant.

On June 26, 2006, pursuant to Rule 3.27 of the West Virginia Rules of Lawyer Disciplinary Procedure,[2] the ODC filed a petition seeking the immediate temporary suspension of Mr. DiTrapano's law license. That same day, he pleaded guilty to Count One of the federal indictment,[3] after which he was released on bond and ordered to report to the Prestera Center (PARCWEST) in Huntington, West Virginia, to complete a twenty-eight day in-house substance abuse treatment program. Thereafter, he was released on conditional home confinement pending sentencing.

Mr. DiTrapano returned to federal court again on August 29, 2006, upon his arrest for violation of his bond as set forth in the United States Probation Office's Petition for Action on Conditions of Pretrial Release. The petition alleged various violations of the conditions of his home confinement. On September 8, 2006, the federal

---

[2] Rule 3.27 of the Rules of Lawyer Disciplinary Procedure states that "upon receipt of sufficient evidence demonstrating that a lawyer (1) has committed a violation of the Rules of Professional Conduct or is under a disability and (2) poses a substantial threat of irreparable harm to the public, the [ODC] shall conduct an immediate investigation." Following the investigation, the ODC must report its findings to the Supreme Court of Appeals. The lawyer has a right to a hearing, and "[a]fter such hearing, the Supreme Court may temporarily suspend the lawyer or may order such other action as it deems appropriate until underlying disciplinary proceedings before the [LDB] have been completed." *Id.*

[3] The government dismissed Count Two *nolle prosequi*.

5

court revoked the petitioner's pre-sentencing release and bond, remanding the petitioner to the custody of the United States Marshal. That day the ODC filed a supplement to its petition seeking immediate temporary suspension of Mr. DiTrapano's law license to this Court. The ODC's petition was granted on September 14, 2006.

Mr. DiTrapano was initially sentenced in federal court on October 10, 2006, to a term of imprisonment of six months and a term of three years supervised release with a recommendation that he participate in a substance abuse treatment program. After serving his imprisonment and while thereafter on supervised release, he again was arrested on April 1, 2007, and charged with simple possession of methamphetamine. On April 10, 2007, Mr. DiTrapano failed a drug screen, testing positive for cocaine. Upon the petition of the Senior United States Probation Officer, the federal court revoked Mr. DiTrapano's supervised release and ordered that he be imprisoned for two years without any subsequent supervised release.

Following the ODC's November 16, 2006, petition seeking the annulment of Mr. DiTrapano's law license as a result of his felony conviction, this Court annulled his law license on May 10, 2007. Having also been admitted to the bar in Georgia, his license there was annulled on November 3, 2008.

6

While in federal prison, Mr. DiTrapano voluntarily participated in a nine-month Residential Drug and Alcohol Assistance Program. Upon being released from prison, he completed a six-month aftercare program at the Community Corrections Center, a halfway house in Rand, West Virginia. Since then, he states that he has continuously attended substance abuse and family counseling, Alcoholics Anonymous and Narcotics Anonymous meetings, and church services. He also states that he has maintained gainful employment. Mr. DiTrapano asserts that he has been clean and sober since April 10, 2007.

On July 17, 2009, the United States Attorney filed an information charging that Mr. DiTrapano, in or about July 2005, at or near Charleston, West Virginia,

> did knowingly make a false statement for the purpose of influencing the actions of United Bank, an institution the accounts of which were then insured by the Federal Deposit Insurance Corporation, in connection with defendant's application to obtain a loan in the amount of $500,000, in that defendant LOUIS DANTE DITRAPANO would and did sign his own name and would and did forge the signature of an individual known to the United States Attorney (hereinafter "Known Individual")[4] to a promissory note in the principal amount of $500,000 and did state to United Bank that the known individual had personally signed the promissory note,

(footnote added), all in violation of 18 U.S.C. § 1014 (2001). On August 27, 2009, Mr. DiTrapano entered a written plea of guilty to the felony charge based on a Stipulation of Facts agreed to by the parties. The Stipulation of Facts stated, in part:

---

[4] The "known individual" was a client and business partner of Mr. DiTrapano.

Mr. DiTrapano represented to United Bank that the known individual would be executing the loan papers and would be jointly liable on the loan. Mr. DiTrapano then took the loan papers from United Bank and represented that he was taking them to the known individual for his signature. Mr. DiTrapano then forged the known individual's signature on the loan papers and returned them to United Bank.

Mr. DiTrapano was aware that the known individual did intend to invest in the project but that the known individual had said that he wanted to fund his portion of the investment, approximately $225,000.00, from the known individual's liquid assets. Mr. DiTrapano knew that the known individual did not intend to be financially responsible for Mr. DiTrapano's portion of the investment. Mr. DiTrapano knew that the arrangement for the project was that Mr. DiTrapano and the known individual would invest a total of $450,000.00, $225,000.00 each, with $15,000.00 in good faith money being provided up front and $435,000.00 due at the closing on the project.

. . . .

Mr. DiTrapano did in fact use $435,000.00 for loan related purposes. . . . Mr. DiTrapano deposited $35,000.00 from the loan proceeds . . . into his personal checking account and subsequently used the money for non-loan related purposes. . . . Mr. DiTrapano took $5,000.00 cash from the loan proceeds that were deposited into the account and used it for non-loan related purposes.[5]

(Footnote added). The court accepted the plea, and following a sentencing hearing on January 14, 2010, Mr. DiTrapano was sentenced to one day of imprisonment, five years

---

[5] The Stipulation of Facts explains that the entirety of the loan, $500,000, was deposited into an account in Mr. DiTrapano's client's name. $435,000 of the loan amount was used for loan related purposes, $35,000 was deposited into Mr. DiTrapano's personal checking account, and $5,000 was taken in cash by Mr. DiTrapano. The Stipulation of Facts does not state what came of the remaining $25,000 in loan proceeds, and we are unable to glean the fate of that sum from the entirety of the record.

supervised release, and 1,000 hours of community service.  He is currently serving his

sentence of supervised release which he expects to complete on January 14, 2015.

### B. Reinstatement Petition and HPS Hearing

On June 1, 2012, pursuant to Rules 3.30[6] and 3.33[7] of the Rules of Lawyer

Disciplinary Procedure ("Rule 3.30" and "Rule 3.33" respectively), Mr. DiTrapano filed

---

[6] Rule 3.30 states, in full:

> When for any reason, other than for nonpayment of
> membership fees, the license of any person to practice law
> has been or shall be suspended or annulled, whether or not for
> a limited time or until requirements as to restitution,
> conditions, or some other act shall be satisfied, such person
> shall not become entitled to engage in the practice of law in
> this State, whether such time has elapsed or such
> requirements as to restitution, conditions, or some other act
> have been satisfied, until such person shall have been restored
> to good standing as a member of the West Virginia State Bar
> as provided herein. Any conviction for false swearing, perjury
> or any felony, and the person's prior and subsequent conduct,
> shall be considered in the determination of good moral
> character and fitness.

[7] Rule 3.33 describes the reinstatement procedure following the annulment of a
lawyer's law license.  The rule imposes the following requirements on a person seeking
reinstatement of his/her law license:

> (b)  After the expiration of five years from the date of
> disbarment, a person whose license to practice law has been
> or shall be annulled in this State and who shall desire
> reinstatement of such license may file a verified petition in
> the Supreme Court of Appeals reciting the cause of such
> annulment and what the person shall have done in satisfaction
> of requirements as to rehabilitation, restitution, conditions or

(continued . . .)

a petition for reinstatement of his law license in West Virginia. On August 3, 2012, he also filed a motion for early termination of his federal sentence of supervised released. That request was denied by order dated September 17, 2012.

Along with his petition for reinstatement, Mr. DiTrapano submitted a Reinstatement Questionnaire ("Questionnaire") as required by Rule 3.33(b). In the Questionnaire, Mr. DiTrapano described, among other things, his wrongdoings. With regard to his felony conviction for being an addict in possession of firearms and his charge for providing a false statement to obtain firearms, Mr. DiTrapano stated:

> In June of 2006, along with the crime of being "an addict in possession of firearms", I was charged with "providing a false statement to obtain firearms." This charge arose from the purchase of a gun at the South Charleston Gun Show where I checked a box that indicated I was not addicted to drugs. This occurred during my relapse and at a time where I was in denial of my disease.

Mr. DiTrapano also discussed his felony conviction for making a false statement to a financial institution. He said in the Questionnaire:

> other acts incident thereto, by reason of which the person should be reinstated as a member of the state bar and his or her license to practice law restored. The petitioner shall also file a completed reinstatement questionnaire provided by the [ODC]. At the time of filing the petition and questionnaire with the Clerk of the Supreme Court of Appeals, the petitioner shall also file a copy of each with the [ODC], which shall conduct a prompt investigation thereof and shall file a report with a [HPS] of the [LDB].

On August 27th, 2009 I pled guilty to 18 USC 1014 (making a false statement to a financial institution). The charge involved me signing my name and the name of my business partner on a loan document. I take full responsibility for my crime and am remorseful for my actions. On January 14, 2010 I was sentenced by Judge Johnston to 1 day in jail, 5 years Supervised Release, and 1000 hours of Community Service. The Federal Sentencing Guidelines calculated a sentence in the range of 41-51 months, but Judge Johnston granted me a variance in the sentence and substantially departed from the guidelines for the following reasons:

i.   The conduct occurred in June 2005 which predated the charge involving the guns that I served the prison sentence on and availed myself to the RDAP Program

ii.  That there were no victims to the crime, all potential victims were made whole and the project that the loan was taken out for was hugely successful

iii. That there was not a complaining witness, the potential victim asked that I not be prosecuted and the potential victim wrote a letter to the Court asking that I not be incarcerated

iv.  That I had a valid power of attorney[8] to sign the potential victims [sic] name to the document

v.   That the episode occurred during my relapse and that while that is not an excuse, it vitiated any intent

vi.  And that the Court received over 100 letters in support of a non-incarcerated sentence and the courtroom was full of community members and lawyers who disagreed with the timing of this prosecution. Most of these findings are set forth more fully in the Sentencing Transcript attached.[9]

---

[8] This Court has defined "power of attorney" as "a written instrument by which one person appoints another as his agent or attorney-in-fact and confers upon him authority to perform certain specified acts. 3 Am. Jur. 2d *Agency* § 23; 2A C.J.S. *Agency* § 150." *Kanawha Valley Bank v. Friend*, 162 W. Va. 925, 928, 253 S.E.2d 528, 530 (1979).

[9] Contrary to Mr. DiTrapano's assertion, the court considered only five of the six factors listed by Mr. DiTrapano in his Questionnaire during the sentencing hearing; the court did not mention the existence of a valid power of attorney.

(continued . . .)

11

(Footnotes added). He further alleged in the Questionnaire that his drug use made him incapable of forming the intent to commit this crime:

> It is also important to note that I certainly lacked the requisite intent to commit any crime that would constitute fraud during my relapse because of my incapacitation. Specifically, on the day I actually signed the bank note, was less exactly 3 weeks after we buried a 6 year old close family friend . . . who drowned in our swimming pool on June 10th 2005. I was in horrible shape emotionally and was trying to deal with the horrible events of that day by numbing my mind. I do not even remember signing the papers at United National Bank that day.

Mr. DiTrapano also included in the Questionnaire a fourth act of wrongdoing:

> Also, when I was in jail/prison during the 2006/2007/2008 years, my former partners at DiTrapano, Barrett and Dipiero paid a client[10] a substantial amount of money that I was responsible for misappropriating. A large part of this money was used for the client but during my relapse, I was too close to this client and did not act professionally in my handling of his Brokerage accounts. Although there are explanations for some of this conduct, I was categorically wrong in my actions, have taken responsibility for them, and have been punished severely. All of the money that was of colorable dispute was paid to the client and charged to me as income during 2005 and 2006. This income caused the extreme financial obligations that I have with the IRS and West Virginia Department of Tax and Revenue. To the extent that any of that amounts to restitution,

---

[10] The client he describes is the "known individual" discussed with regard to the felony conviction for the false statements Mr. DiTrapano made to United Bank.

12

I wanted to disclose that to the Court and the Office of Disciplinary Counsel.

(Footnote added). The amount paid by his former partners to the client was approximately $1.4 million.

Additionally, Mr. DiTrapano disclosed in the Questionnaire that he had previously been admonished by the LDB. He stated that the admonishment arose from a complaint involving the representation of a client in a personal injury matter.[11]

The ODC commenced an investigation pursuant to Mr. DiTrapano's petition for reinstatement. A reinstatement hearing was held on March 27, 2013, and April 17, 2013, to address the matter. Numerous witnesses appeared to testify on behalf of Mr. DiTrapano.[12] Mr. DiTrapano also testified.

---

[11] The Questionnaire states:

> There was a complaint filed (I.D. No: 04-02-007). This involved a complaint of a Personal Injury client . . . who was dissatisfied with her settlement after she agreed to it. The ODC dismissed the case and the file was closed. Arising out of the same case, a complaint was filed (I.D. No: 03-02-078). This complaint involved the Physical therapist for the [client]. This case was heard by the Investigative Panel and I was admonished.

[12] Included in the record were a large number of letters addressed to this Court by members of the public in support of Mr. DiTrapano. The Court acknowledges the submission of these letters.

With regard to his felony conviction for making false statements to United Bank, Mr. DiTrapano told the HPS:

> I could've got the whole note by myself. I had the credit to get the whole note by myself. I did not need my client to get the note. I mean it was a deal and we both went in on the deal and so I went to the bank, thinking that I had authority to do that because I had had numerous conversations with this particular person over the course of the years I represented him . . . .
>     . . . .
> And, you know, it's just -- but apparently, you know, that wasn't the authority that I had. And I'm not disputing that because, you know, I was impaired and I thought that I had the authority. I didn't, obviously. I went in and signed my name on the note and signed is [sic] name on the note, which I had power of attorney to do.
>     . . . .
> It was a legitimate business deal where everybody got paid on it and I thought in my mind, probably impaired, that I had authority to do it and I could understand why I thought that because that was the way we did things, but, you know, the testimony that was made before the grand jury said I did not have that authority.

He explained the reason he sought to take out the loan was to best protect his client's investments:

> I represented him that basic finance, that if you have, you know, a million dollars invested in an investment account that's earning ten percent and you have a short-term business opportunity that you can borrow money at four percent, you leave the money in the principal account to earn the ten percent and you borrow the short-term money, and then you pay it back and therefore, you never disrupt the investment.

The HPS specifically questioned Mr. DiTrapano about loan money that was not used for the purpose of the loan:

14

[DiTrapano]: The part about personal, you know, used the money for personal stuff, I don't know what that was, but it has always stood in my mind that there was a certain amount of money that I had coming to me for some reason and that -- and that I was obligated on the loan and I borrowed the money and the bank knew the deal was not a $500,000 deal, but was a -- I don't know, what was it 470 or something, but whatever it was. And so, you know, I was going to have to pay that money back at that time. I thought. It ended up I got in trouble before I had a chance to do that.

I do stand by those facts, but there probably was some reason, you know, that I put the $35,000 in that account that didn't have to do with, you know, I was just trying to take it for myself. I don't know what that is during that period of time.

[HPS]: Well, would it be fair to say that even though there's a question as to how that money may have been used . . . that you couldn't justify to the other party that the money was in fact meant to be yours; would that be fair?

[DiTrapano]: I think that's fair.

The HPS also questioned Mr. DiTrapano as to the misappropriation of client funds that he described in his Questionnaire. He stated that his former law firm paid to one of Mr. DiTrapano's clients approximately $1.4 million. The firm attributed the $1.4 million as income to Mr. DiTrapano. The ODC questioned him as follows:

Q    . . . [D]o you agree with me that the law firm paid back about $1.4 million?

A    If that's -- yes.

Q    Was that the tax liability that you received?

A    Yes.

Q    Okay. And going to my very next question, the law firm didn't pay any interest. They paid the sum and then assessed you with the income?

A    They assessed me with the income. It was a shift of moneys, you know. It was these accounts -- this money is owed to a client, so, you know, we're going to take

15

this money, pay him and we're going to call it income to you. We're going to expense it and I never -- you know, I got the tax liability on it.

Mr. DiTrapano elaborated:

> I never in my life embezzled any money from my dad's law firm or from my law firm or from myself. As a partner of that law firm, no money ever came out of that law firm. I've never been accused of it. It never happened. The money that the law firm paid back to a specific person was the result of a civil issue at the end of the bookkeeping that showed certain amounts of money gone from certain accounts that I was never asked about or told, you know, what they were doing, other than they were reimbursing this client this amount of money.
>
> And what happened was is [sic] that my interest in the firm and potential future fees and stuff were all given, I guess, to, you know, themselves or, you know, new partners and paid, you know, the -- whatever the accounting showed on the other person when it was over with. You know, I never was asked, you know, where did this go or what happened to this? It was just a matter of accounting.
>
> And the only way that anybody ever knows about that is I disclosed it in my petition when I -- they talked about restitution, I said, DiTrapano, Barrett, and DiPiero paid restitution on, you know, some money to a former client for money that may have been misappropriated or may not have been.

The ODC questioned Mr. DiTrapano further on the issue:

> Q      You don't dispute as you sit here today that you misappropriated funds out of that Smith Barney account?
>
> A      I don't dispute it that it's -- that they were misappropriated, but I don't have any real recollection as to exactly what some of those moneys went for in terms of, you know, what was misappropriated and what was not.
>       . . . .
> Q      Okay. So I'm not sure -- I'm not sure. You know, we can -- I'm not sure if you're taking issue with the term "embezzled" or not, but if you take client funds that

16

don't belong to you, that's still misappropriation and conversion. And we agree with that, right?

A        I mean the problem is that I don't know what happened with any of that money and there was a whole bunch of different things going on, including, you know severe impairment on my part . . . .

. . . .

I think I'm using misappropriated loosely.[13] I don't know. I always used it more in terms of, you know, I don't know what it meant for and, you know, it was wrong for me to, you know, have done anything with -- you know, with that money in the state of mind that I was in. And that's -- you know, that's my position on it.

. . . .

[Q]        But there is no dispute in my mind that you did misappropriate $800,000 from this client out of that Smith Barney account. Do you or do you not agree?

A        I can tell you this, that I accept responsibility for that and for everything that I did wrong that was a result of my addiction and that I am more than -- you know, have gone way overboard with all of the people involved with that in making my own restitution to them for everything that they've done, you know, in support of me in making that restitution . . . .

What I cannot tell you and I still maintain it today is what I did or what happened to that. . . .

Q        Well, they know where it [the money] didn't go, which was to the client.

A        Okay. If that's what you want to say.

Q        Okay. Well, it's not what I want to say. Is that true or not true, it didn't go to the client, correct?

A        I really don't know that, but, you know, I paid it back and I'm taking the position that it all -- that none of it went to the client.

(Footnote added).

---

[13] Black's Law Dictionary defines "misappropriation" as "[t]he application of another's property or money dishonestly to one's own use. See Embezzlement." Black's Law Dictionary 1019 (8th ed. 2004).

### C. The HPS's Report and Recommendation

In its October 17, 2013, report and recommendation, the HPS made findings of fact consistent with those stated in Part I.A., *supra*. The HPS also found that

> Petitioner has worked hard to rehabilitate himself by having completed various substance abuse programs, including the program in prison, as well as continuously participating in substance abuse and family counseling, and has attended Alcoholics Anonymous and Narcotics Anonymous meetings. Petitioner states that he has reconnected and made amends with the people he had hurt when he was an addict, including his family, friends, and former colleagues and clients.

Additionally, the HPS found that Mr. DiTrapano has been gainfully employed for the majority of time his law license has been annulled, and that Mr. DiTrapano intends to pay off his substantial debt despite his eligibility to file for bankruptcy. With regard to the issue of misappropriation, the HPS found that

> [d]uring the time that the Petitioner was incarcerated in relation to his 2006 conviction, his former law partners paid one of his clients approximately $1.4 million dollars that Petitioner had misappropriated. In his Reinstatement Questionnaire, Petitioner stated, "[a] large part of this money was used for the client but during my relapse, I was too close to this client and did not act professionally in my handling of his Brokerage accounts." Petitioner further notes that "[a]lthough there are explanations for some of this conduct, I was categorically wrong in my actions, have taken responsibility for them, and have been punished severely."

The HPS did not make any findings regarding Mr. DiTrapano's previous admonishment.

The HPS concluded that Mr. DiTrapano had "presented an impressive array of witnesses who testified at the hearing, and individuals who provided letters in support" and that those statements and letters "clearly support Petitioner's reinstatement." Furthermore, the HPS determined that Mr. DiTrapano's "addictions were a major mitigating factor" to the "egregious" nature of his two felony convictions. Although concluding that Mr. DiTrapano "has proved a record of rehabilitation by clear and convincing evidence," the HPS noted that he

> had a 15-year period of sobriety before the relapse that contributed to his legal problems. Because relapse is understood to be a not uncommon feature of alcoholism and drug addiction, and because relapse following reinstatement could create substantial adverse effect on the public's confidence in the admission of justice and its perception of the bar, we recommend strong support and monitoring to be included in any conditions for reinstatement.

Finally, while the HPS determined that Mr. DiTrapano's sentence of "supervised release was intended to be rehabilitative rather than punitive," the HPS could not "conclude that the reinstatement of Petitioner's law license will not have a substantial adverse effect on the public in the administration of justice so long as Petitioner is serving his sentence of supervised release."

> The HPS recommended that Mr. DiTrapano's
>
> law license be reinstated without further petition or hearings beginning at the end of petitioner's <u>satisfactory</u> completion and termination of his sentence of supervised release, with the following conditions:

19

1. Petitioner's legal practice be supervised by his employer (or other supervisor) and by the director of the [WVLAP] for two years following his reinstatement pursuant to a written agreement between Petitioner, his supervisor, the director, and the Office of Disciplinary Counsel[;]
2. Prior to reinstatement, Petitioner be required to pay his dues to the West Virginia State Bar and complete all required CLE's;
3. Petitioner be ordered to reimburse the [LDB] the costs of these reinstatement proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.
4. Petitioner be ordered to continue his attendance at Alcoholics Anonymous and Narcotics Anonymous meetings 3-4 times a week[;]
5. Petitioner remain a member of the [WVLAP] for a period of two years from the date of reinstatement and he be available upon request to assist the Board of Directors in speaking to bar members who struggle with alcoholism and/or addiction; and
6. Petitioner, at his expense, give random urine screens to the [WVLAP] for a period of two years from reinstatement.

### D. Request for Hearing Before the Court

Following the October 17, 2013, report of the HPS, the ODC requested a hearing before the Court pursuant to Rule 3.33(c), which provides that the ODC or the petitioner may request a hearing before the Court. Mr. DiTrapano and the ODC submitted briefs to the Court arguing for and against, respectively, the reinstatement of Mr. DiTrapano's law license.

Although Mr. DiTrapano states in his brief to this Court that he was willing to have the case submitted in conference on the recommendations of the HPS, he now

20

asks that the Court adopt the recommendations of the HPS *or* that he "be reinstated immediately, on probation, pursuant to 3.15(1) of The Lawyer Disciplinary Procedure,[14] with the same conditions as the HPS recommended until January 14, 2015, or at the conclusion of his supervised release whichever is sooner." (Footnote added).

This Court heard the arguments from the parties on January 28, 2014, at which time the case was submitted to this Court for decision pursuant to Rule 3.33(e).[15]

## II.

### STANDARD OF REVIEW

We have long held that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984). Thus, while we give respectful consideration to the recommendations of the HPS, this Court ultimately exercises its own independent judgment regarding reinstatement:

> A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law,

---

[14] Rule 3.15 of the Rules of Lawyer Disciplinary Procedure states that the Court may impose probation as a sanction for a violation of the Rules of Professional Conduct.

[15] Rule 3.33(e) states that "[a]fter a hearing on a petition for reinstatement . . . the Court shall, by order entered of record, grant or refuse the petition for reinstatement."

questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994). *See also* Syl. pt. 3, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980) ("Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Ethics Committee in regard to reinstatement of an attorney are to be given substantial consideration.").

The parties herein do not dispute the findings of fact made by the HPS; therefore, we proceed in our analysis by reviewing *de novo* the HPS's recommendation regarding reinstatement.

## III.

## ANALYSIS

The sole issue before this Court is whether we should grant or deny Mr. DiTrapano's petition for reinstatement of his law license. In reinstatement proceedings, the burden lies with the person who seeks reinstatement to show that he/she should be permitted to once again practice law. *In re Brown*, 166 W. Va. at 229, 273 S.E.2d at 569 ("[W]e have always required applicants for reinstatement to carry the burden of

22

establishing their fitness to resume the practice of law."). In syllabus point 1 of *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567, the Court held that

> [t]he general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.

Furthermore, "in assessing an application for reinstatement consideration must be given to the nature of the original offense for which the applicant was disbarred. Obviously, the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement." *Id.* at 234, 273 S.E.2d at 571. Where an applicant for reinstatement has been involved in additional wrongdoing after the rule violation resulting in disbarment, "we do not view the inquiry on reinstatement as limited to the single issue of the precise offense that triggered disbarment[;] . . . [the] applicant's prior and present record of infractions can be considered." *Id.* at 239, 273 S.E.2d at 574.

Mr. DiTrapano asserts that he has proven that he is fit to be readmitted to the bar, emphasizing his rehabilitation from drug addiction and the support he has received from numerous members of the bar and of the community. The HPS agrees that Mr. DiTrapano should be reinstated to the bar, but with conditions. The ODC argues that

23

Mr. DiTrapano's two felony convictions should preclude his reinstatement. The ODC refers to *In re Brown*, in which we stated that "the seriousness of the underlying offense leading to disbarment may, as a threshold matter, preclude reinstatement such that further inquiry as to rehabilitation is not warranted." *Id.* at 240, 273 S.E.2d at 574.

The above-referenced precedent obliges this Court to proceed by first considering the nature of the offenses leading to Mr. DiTrapano's disbarment and other relevant wrongdoings. His misconduct includes a prior admonishment; illegal drug use; multiple arrests, some of which were related to his possession of illegal drugs; knowingly possessing various firearms in and affecting interstate commerce while being an unlawful user of and addicted to a controlled substance, a crime for which he received a felony conviction; knowingly making a false statement and representation to a licensed dealer of firearms regarding his dependence on a controlled substance; knowingly making a false statement for the purpose of influencing the actions of a bank, a crime for which he received a second felony conviction; and "misappropriating" client funds.

The HPS recognized that the conduct underlying the two felonies was egregious, but that Mr. DiTrapano's drug addiction was a major mitigating factor. Mr. DiTrapano attributes all of his misconduct to his drug addiction. The Court has never definitively held that drug addiction should be considered a mitigating factor when

24

considering lawyer misconduct; however, the Court considered the issue in *Lawyer Disciplinary Board v. Brown*, 223 W. Va. 554, 678 S.E.2d 60 (2009).

In *Brown*, attorney Raymond Brown, Jr., while addicted to illegal drugs, stole $8,000 from his client trust account for the purpose of purchasing cocaine. In its recommendation regarding Mr. Brown's law license, the LDB concluded that "chemical dependency should be treated like alcoholism and considered a mitigating factor in determining the appropriate sanction." *Brown*, 223 W. Va. at 559, 678 S.E.2d at 65. Therein, the LDB relied on this Court's decision in *Lawyer Disciplinary Board v. Hardison*, 205 W. Va. 344, 351, 518 S.E.2d 101, 108 (1999), in which the Court "subscribe[d] to the modern view that alcoholism is an illness." However, in deciding *Brown*, we disagreed with the LDB and distinguished alcoholism from drug addiction, deciding that Mr. Brown's addiction to illicit substances should not be a mitigating factor with regard to his misconduct. The Court said:

> While this Court considered alcoholism as a mitigating factor in *Hardison*, the abuse of an illegal substance is clearly distinguishable. Alcohol is a legal substance; cocaine is not. Thus, any attorney who embarks on the use of an illegal substance in the first instance is knowingly violating the law. Courts in some jurisdictions have absolutely rejected the idea of considering addiction to an illegal substance as a mitigating factor.
> . . . .
> Although this Court does not absolutely preclude addiction to illegal drugs as a consideration and while Mr. Brown's actions may have stemmed in part from his cocaine addiction, we simply cannot condone his behavior and cannot accept the Board's recommendation.

*Brown*, 223 W. Va. at 560–61, 678 S.E.2d at 66–67. The Court annulled Mr. Brown's law license, concluding that "[m]isappropriation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty." *Id.* at 561, 678 S.E.2d at 67 (quoting *Lawyer Disciplinary Bd. v. Coleman*, 219 W. Va. 790, 797, 639 S.E.2d 882, 889 (1987)).

As *Brown* makes clear, this Court places a high premium on the honesty of attorneys admitted to practice law in West Virginia. In *Lawyer Disciplinary Board v. Stanton*, 225 W. Va. 671, 678, 695 S.E.2d 901, 908 (2010), the Court agreed with the HPS's observation that

> [t]he public expects lawyers to exhibit the highest standards [of] integrity and honesty. Lawyers have a duty not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice. Lawyers are officers of the court and must operate within the bounds of the law and act in a manner to maintain the integrity of the Bar.

Honesty is such an important quality in attorneys that the West Virginia Rules of Professional Conduct specifically and implicitly require that attorneys deal honestly with their clients, courts, and with third parties. *See, e.g.*, Rules of Professional Conduct, Rule 3.3 ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal . . . ."); Rules of Professional Conduct, Rule 4.1 ("In the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person . . . ."); Rules of Professional Conduct, Rule 8.1 ("An applicant for

26

admission to the bar . . . shall not . . . knowingly make a false statement of material fact . . . .”); Rules of Professional Conduct, Rule 8.4 (“It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer’s honesty, trustworthiness or fitness as a lawyer in other respects[, or] engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . .”). The Rules of Professional Conduct provide the guidelines by which attorneys must conform their conduct so as to protect the public and the public’s perception of the administration of justice. *See* syl. pt. 4, in part, *Lawyer Disciplinary Bd. v. Sayre*, 207 W. Va. 654, 535 S.E.2d 719 (2000) (“Disbarment of an attorney to practice law . . . is for the protection of the public and the profession.”).

The misconduct to which Mr. DiTrapano admits in his Questionnaire is replete with dishonest activity. Although he was not convicted of knowingly making a false statement and representation to a licensed dealer of firearms regarding his dependence on a controlled substance, he admitted in the Questionnaire that he “checked a box that indicated [he] was not addicted to drugs” while he was in fact addicted to drugs. He stated that “this occurred during [his] relapse and at a time where [he] was in denial of [his] disease.”

Far more troubling is Mr. DiTrapano’s conviction for knowingly making a false statement for the purpose of influencing the actions of a bank. Mr. DiTrapano presents this criminal activity as one single instance of dishonesty resulting from his drug

27

addiction. We cannot see the crime so superficially; his behavior involved numerous instances of deceit that necessarily involved premeditation, planning and patience. Moreover, this dishonesty involved his relationship with his client, a position of trust. The Stipulation of Facts makes clear that the crime was committed during at least two visits to the bank; Mr. DiTrapano consulted with the bank, he left, and then he returned with the signed documentation. Over that span of time, Mr. DiTrapano lied to the bank about his client's intent to be liable on the loan, ultimately subjecting his client to a $500,000 liability. He admitted that he knew his client did not desire to acquire the loan. Furthermore Mr. DiTrapano forged his client's signature. The facts also indicate that Mr. DiTrapano transferred at least $35,000 of the loan proceeds into his personal checking account and that he took an additional $5,000 in cash without a legitimate justification for doing so.[16]

Mr. DiTrapano now attempts to minimize his dishonest conduct by stating that the loan was ultimately paid in full and that his client was not harmed by his actions. The gravity of Mr. DiTrapano's misconduct cannot be minimized by the lack of harm; "[t]here does not exist in the Rules of Professional Conduct a 'no harm, no foul' Rule." *Lawyer Disciplinary Bd. v. Blevins*, 222 W. Va. 653, 659, 671 S.E.2d 658, 664 (2008). Mr. DiTrapano also asserted in his Questionnaire that the fraudulent activity culminating

---

[16] At a minimum, this $40,000 would appear to have been converted by Mr. DiTrapano from its purported purpose to his own personal use.

28

in acquisition of the loan occurred at the height of his drug addiction and shortly after the death of the child at his home. He stated that at the time, he was using drugs to numb his mind and that he did not "remember signing the papers at United National Bank that day."[17]

With our examination of Mr. DiTrapano's honesty, we must also consider the "misappropriation" he alleged in his Questionnaire. We are deeply troubled by his report that his former law firm "paid a client a substantial amount of money [approximately $1.4 million] that [he] was responsible for misappropriating." Mr. DiTrapano represents that, during the time period in question, he was addicted to illegal drugs and did not remember how his client's funds were used. While he was questioned numerous times about his conduct by the ODC and the HPS, the facts that might elucidate why the law firm paid its client $1.4 million dollars and why that amount was attributed to Mr. DiTrapano as income were never fully developed. As we recognized above, the burden is on Mr. DiTrapano to prove that he is fit to resume the practice of law, yet he has not provided this Court with the information necessary to fully evaluate this issue. The facts before the Court give rise to an inference that Mr. DiTrapano

---

[17] Upon our review of the record, we find that the only portion of the misconduct regarding the bank fraud that Mr. DiTrapano claims he does not remember is signing loan papers at the bank.

mishandled and converted a substantial sum of his client's funds.[18]  With regard to the alleged misappropriation, Mr. DiTrapano has left us with major apprehensions regarding his integrity and honesty.

We now return to the question of whether Mr. DiTrapano's drug addiction should be considered a mitigating factor with regard to his dishonest conduct.  We are loath to find that it should.  To begin with, the misconduct involved in this case is nothing like *Hardison*, in which the Court recognized alcoholism as a mitigating factor. In *Hardison*, "[t]he gravamen of the complaints against Hardison show[ed] a pattern of neglect or inattention to the needs of his clients, lack of communication with clients, and failure to pursue his clients' cases and meet deadlines." 205 W. Va. at 351, 518 S.E.2d at 108.  Mr. DiTrapano's misconduct was not passive like the conduct in *Hardison*; Mr. DiTrapano affirmatively acted in a deceitful and dishonest manner.

Furthermore, while *Brown* states that "this Court does not absolutely preclude addiction to illegal drugs as a consideration," we indicated that we would only consider drug addiction as a mitigating factor where the misconduct stems from that addiction. 223 W. Va. at 561, 678 S.E.2d at 67; *see also Hardison*, 205 W. Va. at 351,

---

[18] Unfortunately, we find the record incomplete and undeveloped on this important issue. We are dismayed that so important an issue as a "misappropriation" for which Mr. DiTrapano's former partners paid approximately $1.4 million to a former client was not developed by the parties in this reinstatement case.

518 S.E.2d at 108 ("This Court is convinced that Hardison's problems stem from his alcoholism and drug addiction."). In *Brown*, although the Court found that "Mr. Brown's actions may have stemmed in part from his cocaine addiction," we could not find that his addiction was a mitigating factor because of the level of dishonesty involved in his misconduct. *Id.*

Although Mr. DiTrapano alleges that his misconduct was the direct result of his drug addiction, he has not alleged that his dishonest conduct stemmed from his addiction. Upon our review, we fail to see any connection—*i.e.*, the direct purpose of his conduct was to acquire illegal drugs—between his drug use and his dishonest behavior. Furthermore, specifically with regard to the bank loan, even if there was some connection, the fact that the transaction took multiple steps to complete and involved multiple instances of dishonesty indicates that Mr. DiTrapano acted intentionally and knowingly, not merely as a reaction to his addiction. Therefore, we find that Mr. DiTrapano's drug addiction is not a mitigating factor with regard to his misconduct.

Now we turn to whether, pursuant to *In re Brown*, the seriousness of the underlying offenses in this case, as a threshold matter, precludes reinstatement such that further inquiry as to Mr. DiTrapano's rehabilitation is not warranted. Undoubtedly, his misconduct, some of which involves deceit and dishonesty, is serious and would itself warrant sanction if he still had his law license. Rule 3.18(d) of the Rules of Disciplinary

31

Procedure provides that an attorney's law license may be suspended or annulled upon that attorney's conviction of a crime that reflects adversely on the attorney's honesty, trustworthiness, or fitness. We have held that "[d]etaining money collected in a professional or fiduciary capacity without bona fide claim coupled with acts of dishonesty, fraud, deceit or misrepresentation justify annulment of an attorney's license to practice law." Syl. pt. 5, *Committee on Legal Ethics v. Pence*, 161 W. Va. 240, 240 S.E.2d 668 (1977). Additionally, "[t]his Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment." Syl. pt. 5, in part, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

With respect to the facts developed below, we begin by finding that Mr. DiTrapano was disbarred for his felony drug conviction. He was also arrested several additional times for possession of illegal drugs and for vehicle registration and licensing offenses. We recognize that neither the drug conviction nor the other offenses directly relate to the representation of his clients. While this misconduct may not directly reflect on his honesty in an attorney-client relationship, it does evidence a disregard for the law.

Although Mr. DiTrapano admits to lying to procure firearms while he was addicted to drugs, an illegal act for which he was indicted, the record is clear that Mr.

32

DiTrapano's firearms were meant for sport or collection purposes. They were in no way connected to his representation of clients or his role as an attorney, and they were not purchased to be used in furtherance of his drug addiction. However, this misconduct does reflect on his honesty, and it too shows a disregard for the law.

Undoubtedly, Mr. DiTrapano's misconduct regarding the bank loan would have warranted his disbarment even in the absence of any other misconduct. His behavior gives us serious doubt as to his integrity and his ability to adequately represent and protect clients' interests. We are, however, cognizant of Mr. DiTrapano's argument that his primary purpose for taking out the loan was to protect his client's assets. We acknowledge Mr. DiTrapano's argument that although the fraud he perpetrated on the bank resulted in unwanted liability being placed on his client, his motive was not entirely selfish. This argument, however, ignores the uncontested fact that Mr. DiTrapano diverted some of these loan proceeds to his personal checking account. This misconduct not only involves dishonesty and a disregard for the law, it constitutes an act of "[m]isapproriation of funds by an attorney [involving] moral turpitude . . . an act infected with deceit and dishonesty." *Brown*, 223 W. Va. at 561, 678 S.E.2d at 67 (quoting *Lawyer Disciplinary Bd. v. Coleman*, 219 W. Va. 790, 797, 639 S.E.2d 882, 889 (1987)).[19]

_____

[19] Because the parties failed to adequately develop the necessary facts by which we can determine whether Mr. DiTrapano engaged in misconduct with regard to the

(continued . . .)

33

We have held that "[r]ehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." Syl. pt. 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567. In *In re Smith*, 214 W. Va. 83, 85, 585 S.E.2d 602, 604 (1980) (quoting *In re Hiss*, 333 N.E.2d 429 (1975)), we recognized a five-factor test in evaluating rehabilitation:

> In judging whether a petitioner satisfies these standards and has demonstrated the requisite rehabilitation since disbarment, it is necessary to look to (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills.

We have already discussed the majority of relevant material regarding the first and second factors of the *In re Smith* rehabilitation test, finding that the nature of his many offenses is egregious and that his actions reflected poorly on his integrity, truthfulness, and character. We add that he committed his offenses as an experienced and

----

"misappropriation" of $1.4 million in his client's funds, we do not now consider the issue under our threshold analysis. *See In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (refusing to consider rehabilitation because of the seriousness of the underlying offenses of bribing a juror and conspiring to bribe public officials). We are, however, greatly disturbed by this "misappropriation."

mature attorney, having been admitted to the West Virginia State Bar for at least ten years.

Regarding the fourth factor, seven years have passed since the annulment of Mr. DiTrapano's law license and the issuance of this opinion. With regard to the passage of time, the Court said in *Lawyer Disciplinary Board v. Moore*, 214 W. Va. 780, 793, 591 S.E.2d 338, 351 (2003):

> Many reasons can be seen for considering of the passage of time in evaluating a petition for reinstatement from disbarment. Time may bring greater maturity than at the time of the misconduct; time may give an opportunity for a person to recognize, address, and overcome the circumstances and conditions that led to the misconduct; time may reduce the perception of the misconduct's gravity, perhaps because of changing mores or by placing the conduct in a historical perspective.

The passage of time does not weigh in favor of Mr. DiTrapano. As we recognized above, he was a mature and experienced attorney when he committed the misconduct, and the gravity of his conduct, because it involves dishonesty, is great. While he has taken steps to address some of the circumstances leading to his misconduct, for the reasons discussed more fully below with regard to the third *In re Smith* factor, we find these actions to be less than adequate.

35

The fifth factor does not require much elaboration; there is no dispute in the record that Mr. DiTrapano has the competence and skill necessary to practice law. Our independent review of the record leads us to the same conclusion.

In our consideration of the third *In re Smith* factor, i.e., Mr. DiTrapano's conduct since the annulment of his law license, we applaud Mr. DiTrapano for remaining clean and sober since April 10, 2007. From the cases involving addiction that come before the courts in this state, this Court is keenly aware of the devastating effects of addiction and the difficulties in treating and overcoming addiction. We also recognize the extensive community service performed by Mr. DiTrapano. He has clearly made great efforts to rebuild his life outside of his addiction, sustaining himself through gainful employment since his release from prison. His labors have not gone unnoticed in his community; relatives, friends and neighbors provided testimony and letters in support of his readmission.

Upon our careful review of the record, however, we found inconsistencies between his statements to the HPS, the Questionnaire, and the Statement of Facts that lead us to question his appreciation of the wrongfulness of his misconduct and his ability to conform his behavior to the Rules of Professional Conduct at this time. Because of these inconsistencies, we do not believe that Mr. DiTrapano has demonstrated adequate rehabilitation with regard to his honesty and integrity.

36

First, in the Questionnaire, Mr. DiTrapano made a false statement regarding the sentencing hearing on his bank fraud conviction. He alleged that one of the facts considered by the judge in determining his sentence was the existence of a valid power of attorney affording him the authority to sign his client's name. We have reviewed the entire transcript of the sentencing hearing, and we find that it is absent any of discussion a power of attorney. We believe that the falsehood in the Questionnaire was not a mere mistake; during his testimony before the HPS, Mr. DiTrapano repeated that he had a power of attorney. While a power of attorney may have existed, the facts are clear that it did not confer upon Mr. DiTrapano the authority to sign his client's name to the loan documents. We find that Mr. DiTrapano's continued reference to and reliance on a power of attorney is an attempt to minimize his responsibility for his misconduct.

Second, when testifying before the HPS, Mr. DiTrapano repeatedly stated that he thought he had the authority to sign his client's name to the loan documents.[20] However, the Stipulation of Facts states that Mr. DiTrapano was aware that the known individual intended to fund his portion of the investment from his liquid assets, not from

---

[20] Mr. DiTrapano did not comment on his authority to tell the bank falsehoods regarding his client's intent to execute the loan documents, his client's intent to be jointly liable on the loan, and his own intent to take the loan documents to the client for the client's signature.

a loan.   The positions are inconsistent.   We must again conclude that this behavior indicates Mr. DiTrapano's unwillingness to take full responsibility for his misconduct.

Third, the Questionnaire is not consistent with Mr. DiTrapano's testimony before the HPS.   In the Questionnaire, he stated that his former firm paid his client "a substantial amount of money that [he] was responsible for misappropriating."   However, before the HPS, he changed his position, stating that the money "may have been misappropriated or may not have been."   Furthermore, he admitted in the Questionnaire that his behavior was "categorically wrong," but before the HPS he testified that he had not seen any of the accounting done by the firm and, "I don't know what happened with any of that money."   Without having any recollection of his actions, and without seeing the accounting performed by his firm, we fail to see how Mr. DiTrapano could affirmatively and honestly state in the Questionnaire that he was "categorically wrong" regarding his handling of the funds in question.   Again, we must conclude that Mr. DiTrapano is reluctant to take responsibility for his misconduct.

In *Moore*, the Court quoted the HPS's discussion of the role of the non-acceptance of responsibility for wrongful acts in reinstatement cases.  It said,

> The notion of remorse is an important consideration in many areas of law. Courts routinely consider remorse in sentencing. Moreover, in other reinstatement cases, the Court has recognized that repentance can be a positive factor for reinstatement. *See, e.g.*, *Lawyer Disciplinary Board v. Pence*, 194 W.Va. 608, 616, 461 S.E.2d 114, 122 (1995) ("We are

38

also mindful of Mr. Pence's stated personal remorse, embarrassment and shame for the conduct that led to disciplinary action being taken against him") and *Lawyer Disciplinary Board v. Vieweg*, 194 W.Va. 554, 560, 461 S.E.2d 60, 66 (1995) ("the record demonstrates that Mr. Vieweg has been forthright in admitting his misconduct and has discussed his actions with some of those who have suffered from the misconduct"). Certainly, if repentance is a positive factor in some cases, the absence of repentance may be relevant to a decision in others.

*Moore*, 214 W. Va. at 794, 591 S.E.2d at 352. The Court concluded that while "the fact that a person does not acknowledge their past misconduct, for whatever reason, will not *per se* bar the consideration or granting of a petition for reinstatement," the fact "is simply another piece of evidence to consider, and to be given such weight as it deserves in light of the circumstances." *Id.* at 795, 591 S.E.2d at 353; *cf.* syl. pt. 4, in part, *In re Dortch*, 199 W. Va. 571, 486 S.E.2d 311 (1997) ("When assessing the moral character of an applicant [to the West Virginia State Bar] whose background includes a criminal conviction, the following factors should be considered: . . . (8) The applicant's current attitude about the prior offenses (e.g., acceptance of responsibility for and renunciation of past wrongdoing, and remorse) . . . ."). In *Moore*, the HPS determined that the evidence of "Moore's continuing failure to appreciate the misconduct . . . is another reason to seriously question whether Moore has the 'integrity and high moral character' that both the Bar and the public have a right to expect of those who practice law in West Virginia." 214 W. Va. at 791, 591 S.E.2d at 349. In the case at bar, the evidence of Mr. DiTrapano's unwillingness to accept responsibility for his actions, which compels us to

39

question his integrity and moral character, weighs against finding that he is rehabilitated.[21]

More compelling are the falsehoods. These also indicate that Mr. DiTrapano's inclinations regarding the truth have not been amended to an extent that would overcome the nature of his prior dishonest conduct. While he may no longer be under the influence of illegal drugs, we cannot overlook his failure to be thoroughly forthright with the LDB and this Court.

In view of the foregoing, we choose not to adopt the recommendation of the HPS, and we deny Mr. DiTrapano's petition for reinstatement of his law license. Mr. DiTrapano has failed to carry his burden of showing this Court that he currently possesses the integrity and moral character necessary to resume the practice of law. We conclude that reinstatement would have a justifiable and substantial adverse effect on the public's confidence in the administration of justice.

---

[21] If Mr. DiTrapano's law license had not already been annulled and the Court was instead deciding on an appropriate sanction, his failure to take full responsibility for his behavior would constitute an aggravating factor, potentially justifying an increase in the degree of discipline imposed. *See* syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003) (holding that aggravating factors may justify increasing the degree of discipline imposed); *Lawyer Disciplinary Bd. v. Aleshire*, 230 W. Va. 70, 79, 736 S.E.2d 70, 79 (2012) (finding that the attorney's refusal to acknowledge the wrongful nature of his conduct constituted an aggravating factor).

Rule 3.33(g) of the Rules of Lawyer Disciplinary Procedure states that when the Court denies a petition for reinstatement, "the Court may enter an order of judgment requiring the petitioner to reimburse the Office of Disciplinary Counsel for the ordinary and necessary costs expended in connection with the petition for reinstatement." Pursuant to this rule, Mr. DiTrapano is ordered to pay the ODC the costs it incurred in this proceeding.

## IV.

## CONCLUSION

We reject the HPS's recommendation, and we refuse to reinstate Mr. DiTrapano's law license at this time. We order that Mr. DiTrapano pay the ODC the costs it expended in connection with this petition for reinstatement.

Petition denied.